**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 29 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

CONNIE ROSKA, on behalf of minor
children Rusty and Jessica Roska, and
Maria Stewart; JAMES ROSKA, on
behalf of minor children Rusty and
Jessica Roska, and Maria Stewart;
RUSTY ROSKA,

        Plaintiffs - Appellants,

    v.

CRAIG T. PETERSON; MELINDA
SNEDDON; SHIRLEY MORRISON;
COLLEEN LASATER; DAN
CHOATE; DARLA RAMPTON,

        Defendants - Appellees.

No. 01-4057

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D. Ct. No. 1:99-CV-112-B)

---

Steven C. Russell, Affordable Legal Advocates, P.C., Salt Lake City, Utah,
appearing for Appellants.

Nancy L. Kemp, Assistant Attorney General (Mark L. Shurtleff, Utah Attorney
General, with her on the brief), Office of the Attorney General, Salt Lake City,
Utah, appearing for the Appellees.

---

Before **TACHA**, Chief Circuit Judge, **BALDOCK**, and **LUCERO**, Circuit
Judges.

**TACHA**, Chief Circuit Judge.

These matters are before the court on appellees' petition for rehearing with suggestion for rehearing en banc. We granted appellees' petition for rehearing in an order dated October 31, 2002. Pursuant to that order, the court's opinion of September 5, 2002, is withdrawn and replaced by this revised published opinion.

OPINION

Plaintiffs brought this suit under 42 U.S.C. § 1983, alleging various rights deprivations under the Fourth and Fourteenth Amendments. The district court found that defendants were entitled to qualified immunity and dismissed the suit. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM in part, REVERSE in part, and REMAND for further proceedings.

I. Background

On May 20, 1999, Connie Roska dropped off her 12-year-old son, Rusty Roska, at school. He was wearing a parka even though it was 70 degrees outside. Patricia Maynor, a school nurse, noticed that Rusty looked ill, was sweating, and had a pallid complexion. Mrs. Roska apparently stated that Rusty was suffering from kidney failure. The school nurse called Rusty's rehabilitation physician, Dr. Judith Gooch, who allegedly informed the nurse that Rusty did not have kidney

failure.[1]

On May 26, 1999, employees for the Davis County School District met with Melinda Sneddon, a caseworker for Utah's Division of Child and Family Services (DCFS). The school district employees expressed concern for Rusty's health and provided several documents to DCFS. These documents included records showing that in April 1998, Mrs. Roska told a teacher that Rusty had a hole in his esophagus. In addition, the school nurse informed Sneddon that Mrs. Roska had told her that Rusty had parasites in his intestines. Further, school officials reported that Rusty's healthy appendix had been removed at Mrs. Roska's insistence. Finally, school officials reported that Rusty looked worse every day and expressed concern that Rusty might die unless DCFS intervened. Further investigation indicated that Mrs. Roska had allegedly claimed that Rusty suffered from a disease that is only suffered by 10 or 100 people in the world.

Sneddon assigned Shirley Morrison, another caseworker, to investigate. Morrison suspected that Mrs. Roska suffered from Munchausen Syndrome by Proxy ("MSBP"), a disorder where an individual, usually a mother, inflicts physical harm upon his or her children in order to gain the sympathy and attention of medical personnel. E. Selene Steelman, Note, A Question of Revenge: Munchausen Syndrome by Proxy and a Proposed Diminished Capacity Defense

---

[1] Dr. Gooch denies having this conversation.

for Homicidal Mothers , 8 Cardozo Women's L.J. 261, 262-63 (2002). [2]

Morrison's investigation revealed that one of Rusty's psychologists and a doctor at Primary Children's Hospital had suspected MSBP but were unable to substantiate a diagnosis. Although Morrison later admitted that Rusty was not in imminent danger of death, [3] the decision was made to remove Rusty from the

---

[2] Munchausen Syndrome by Proxy was first diagnosed in 1977. It is a variation of Munchausen Syndrome, a disorder named after Karl Fredrich von Munchausen, a German nobleman with a penchant for telling lies about his adventures in life. Melissa A. Prentice, Note, Prosecuting Mothers Who Maim and Kill: The Profile of Munchausen Syndrome by Proxy Litigation in the Late 1990s, 28 Am. J. Crim. L. 373, 376 (2001); see also The Adventures of Baron von Munchausen (Columbia Pictures 1988). While patients with traditional Munchausen Syndrome induce or exaggerate their own illnesses in order to gain the attention of medical professionals, MSBP patients cause such illness in others. Id. MSBP patients are usually mothers in their twenties. The "proxy" is usually a child, often a pre-verbal infant or toddler. Id. MSBP patients often "smother their child; inject him with insulin; feed him poison, ipecac, or laxatives; cause dehydration; overmedicate; induce fevers, diarrhea, vomiting, or seizures; or contaminate blood, urine, or feces samples." Id. There have been an estimated 200 to 1000 cases diagnosed since doctors first isolated the syndrome. Id. at 377.

[3] During Morrison's deposition, the following colloquy occurred:

Q:     Did you think on that day [the 27th] that if you didn't remove him, he would die within a few days?

A [Morrison]: No.

Q:     Did you think that if you didn't remove him, he would die within a week?

A:     No.

Q:     A month?

(continued...)

Roskas' home.

On May 28, 1999, Morrison and Sneddon met with an Assistant Attorney General of Utah, Craig Peterson, who advised them that the facts supported removing Rusty from the home. Morrison and Sneddon, accompanied by a police officer, allegedly entered the Roska residence, without a warrant and without knocking, and proceeded to remove Rusty. Before leaving, they were admonished over the phone by Doctor Gooch that removal could destroy "this family emotionally and Rusty may never recover." Sneddon consulted with her supervisor, Colleen Lasater, and then proceeded with the removal. Plaintiffs contend that, while in the home, Sneddon pushed Rusty's sisters, Maria Stewart and Jessica Roska, as they attempted to comfort Rusty, and abused others in the home, both physically and verbally. DCFS placed Rusty in a foster home, where he allegedly was not given proper medication for his chronic pain.

At an initial shelter hearing on June 3, 1999, the juvenile court ruled that Rusty should remain in protective custody. After additional evidence was produced the next day, the court ordered that Rusty be returned to the Roskas'

_____

[3](...continued)
A:    I have no way to know that.

Q:    You are pretty sure it wouldn't be a few days?

A:    Pretty sure.

care. The court also ordered the Roskas to permit substantial intervention by DCFS in Rusty's treatment.

On October 6, 1999, plaintiffs commenced this action under 42 U.S.C. § 1983. The plaintiffs are Rusty Roska, Connie and James Roska (Rusty's parents), and Maria Stewart and Jessica Roska (Rusty's sisters). The defendants are Craig Peterson, Assistant Attorney General for the State of Utah; Melinda Sneddon, a social worker with DCFS; Shirley Morrison, a social worker with DCFS; Colleen Lasater, Sneddon's and Morrison's supervisor; and Dan Choate and Darla Rampton, DCFS placement workers who placed Rusty in a foster home. The first, third, fourth, and fifth causes of action are directed against Peterson, Sneddon, and Morrison and allege three Fourth Amendment violations[4] and a Fourteenth Amendment violation.[5] The second cause of action alleges that defendants Sneddon and Morrison used unreasonable force in violation of the Fourth Amendment. The sixth and seventh claims allege that all defendants violated Rusty's Fourteenth Amendment substantive due process right to be safe from harm while held by the state (Count 6) and Mr. and Mrs. Roska's Fourteenth Amendment rights to direct their children's medical care (Count 7). Finally,

---

[4] Plaintiffs allege that their Fourth Amendment rights were violated when defendants unreasonably searched the plaintiffs' home (Count 1), unreasonably seized Rusty (Count 2), and abused and kidnapped Rusty (Count 4).

[5] Plaintiffs allege that defendants violated their Fifth and Fourteenth Amendment rights to maintain a family relationship (Count 5).

plaintiffs' eighth cause of action is against defendant Morrison for alleged malicious prosecution and abuse of process. The district court granted defendants summary judgment on grounds of qualified immunity. We now affirm in part, reverse in part, and remand for further proceedings.

## II. Discussion

### A.    Standard of Review

We review de novo a district court's ruling on qualified immunity. Farmer v. Perrill, 288 F.3d 1254, 1259 (10th Cir. 2002). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Id. To determine whether a plaintiff can overcome the qualified immunity defense, "first we determine whether the plaintiff has asserted a violation of a constitutional or statutory right, and then we decide whether that right was clearly established such that a reasonable person in the defendant's position would have known that [his] conduct violated that right." Garramone v. Romo, 94 F.3d 1446, 1449 (10th Cir. 1996) (citation omitted). Order is important; we must decide first whether the plaintiff has alleged a constitutional violation, and only then do we proceed to determine whether the law was clearly established. Saucier v. Katz, 533 U.S.

-7-

194, 200 (2001).

B. Violation of a Constitutional Right [6]

In conducting our qualified immunity analysis, we must first consider "whether plaintiff's allegations, if true, establish a constitutional violation." Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 2513 (2002) (citation omitted). We consider each of the plaintiffs' allegations in turn.

1. *Fourth Amendment Claims (Counts 1, 2, 3, 4, and 8)*

The Fourth Amendment, applied to the states through the Fourteenth Amendment's Due Process Clause, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend IV. Plaintiffs advance five theories upon which a Fourth Amendment violation might be found. We address each in turn.

a. The Warrantless Entry (Count 1) [7]

It is well-established that a warrantless search is presumptively

---

[6] Although plaintiffs challenge the constitutionality of the defendants' conduct, plaintiffs do not challenge the state statutes to the extent the statutes authorized the conduct in question.

[7] In the district court, plaintiffs also alleged that defendants failed to knock prior to entering the Roskas' home. The plaintiffs did not, however, advance this argument in their initial brief on appeal. Accordingly, defendants did not have an opportunity to respond and the argument is not properly before us. The district court on remand, however, may reconsider this aspect of plaintiffs' Fourth Amendment claim, in light of our discussion, infra.

unreasonable under the Fourth Amendment and therefore invalid unless it falls within a specific exception to the warrant requirement. United States v. Zubia-Melendez, 263 F.3d 1155, 1162 (10th Cir. 2001). In this case, it is undisputed that defendants failed to obtain a warrant before entering and searching the Roskas' residence. Thus, defendants' actions were presumptively unreasonable under the Fourth Amendment unless an exception to the warrant requirement applies. Id. Defendants point to two possible exceptions to the warrant requirement. We consider each in turn.

(1) Exigent circumstances

First, the defendants point to the "exigent circumstances" exception to the warrant requirement. Exigent circumstances exist when:

> (1) the law enforcement officers . . . have reasonable grounds to believe that there is immediate need to protect their lives or others or their property or that of others, (2) the search [is not] motivated by an intent to arrest and seize evidence, and (3) there [is] some reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched.

United States v. Anderson, 981 F.2d 1560, 1567 (10th Cir. 1992) (alterations in original). The government bears the burden of proving exigency. United States v. Wicks, 995 F.2d 964, 970 (10th Cir. 1993). The government's burden is "particularly heavy where the police seek to enter a suspect's home." Anderson, 981 F.2d at 1567 (quoting United States v. Maez, 872 F.2d 1444, 1452 (10th Cir. 1989)). In evaluating whether exigent circumstances existed, we examine the

circumstances "as they would have appeared to prudent, cautious, and trained officers." United States v. Anderson, 154 F.3d 1225, 1233 (10th Cir. 1998). This exception is narrow, and must be "jealously and carefully drawn." Id.

After examining the record, we conclude that it contains no evidence that could lead a reasonable state actor to conclude that there were exigent circumstances. Although defendants at times assert that a delay to obtain a warrant might have cost Rusty his life, the evidence shows otherwise. Defendants were aware that various doctors had suspected that Rusty was a victim of MSBP for quite some time, and the record indicates that there was nothing particularly unusual about Rusty's condition at the time he was removed. Rusty's attending physician stated on the phone that it would be a mistake to remove him from the home. Because no evidence indicates that Rusty was in immediate threat of death or severe physical harm – indeed, the evidence points to the opposite conclusion – we do not find sufficient exigent circumstances to relieve the state actors here of the burden of obtaining a warrant. See Coolidge v. New Hampshire, 403 U.S. 443, 470-71 (1971) ("But where the discovery is anticipated, where the police know in advance the location of the evidence and intend to seize it . . . [t]he requirement of a warrant to seize imposes no inconvenience whatever, or at least none which is constitutionally cognizable in a legal system that regards warrantless searches as 'per se unreasonable' in the absence of 'exigent

circumstances.'").

(2)   The "special needs" doctrine  [8]

Within the last thirty years, courts have increasingly recognized certain narrow circumstances that justify searches and seizures without reference to the Fourth Amendment's warrant clause or probable cause requirement. These are situations in which the requirement of a warrant based upon probable cause is ill-suited to achieving certain "special needs" of government, such as enforcing school discipline, New Jersey v. T.L.O., 469 U.S. 325, 333-40 (1985), allowing administrative searches of the business premises of "closely-regulated industries," New York v. Burger, 482 U.S. 691, 700 (1987), and taking inventory of seized items for "caretaking" purposes, Cady v. Dombrowski, 413 U.S. 433, 447-48 (1973).

In all "special needs" cases, the nature of the need addressed makes particularized suspicion impossible or otherwise renders the warrant requirement impractical. For example, in Griffin v. Wisconsin, the Court noted that requiring a warrant before a search of a probationer's home would "interfere to an

---

[8] Defendants do not make this argument directly. Rather, the defendants argue that "clearly established" law did not rule out the applicability of the "special needs" doctrine to the facts of this case. Consideration of this argument requires us to answer two questions: (1) whether the "special needs" doctrine applies on the facts of this case; and (2) whether "clearly established" law provided the reasonable state actor "fair warning" of the inapplicability of the "special needs" doctrine to the facts of this case.

-11-

appreciable degree with the probation system," and would "reduce the deterrent effect that the possibility of expeditious searches would otherwise create." 483 U.S. 868, 876 (1987) (citation omitted). Similarly, the Burger Court noted that "surprise is crucial if the regulatory scheme aimed at remedying this major social problem is to function at all." 482 U.S. at 710; see also Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 619 (recognizing that the special need articulated must "'make the warrant and probable-cause requirement impracticable'" before waiving those requirements). If a special need renders the warrant requirement impracticable, we then balance the nature of the privacy interest upon which the search intrudes and the degree of intrusion occasioned by the search against "the nature and immediacy of the governmental concern at issue . . . and the efficacy of this means for meeting it." Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 660 (1995).

We find no special need that renders the warrant requirement impracticable when social workers enter a home to remove a child, absent exigent circumstances. First, we note that individualized suspicion is at the heart of a removal of a child from a home, distinguishing the instant case from the various drug testing cases that have been addressed by the Court. Second, unlike the situation in Burger (and assuming that exigent circumstances are not present), there is no need for surprise or sudden action that renders obtaining a warrant

-12-

counterproductive. Nor is this situation similar to the position of the probationer in <u>Griffin</u> – the Roskas were not in the criminal justice system, there was no deterrent function being served by the threat of a sudden, warrantless search, and there was no immediate need for a quick response. [9] Simply put, unless the child is in imminent danger, there is no reason that it is impracticable to obtain a warrant before social workers remove a child from the home. Defendants took the time to seek the advice of an Assistant Utah Attorney General before proceeding with the removal; surely they could have taken the time to incur the minimal inconvenience involved in obtaining a warrant. <u>Burger</u>, 482 U.S. at 727 (Brennan, J., dissenting).

It is true that the state has a strong interest in protecting children, and that this interest should be taken into account in evaluating the reasonableness of the search and seizure challenged by plaintiffs. However, what is reasonable under the Fourth Amendment "depends on the context within which a search takes place." <u>T.L.O.</u>, 469 U.S. at 337. The action challenged in this case involved not

_____

[9] This statement is not meant to foreclose the possibility that a special need justifying an abrupt, warrantless search of a home might be present when a family is already in the DCFS system or when a child has been placed in a foster home. These are situations where routine, random inspections <u>might</u> be needed in order to assure the safety of the child's conditions. But that is simply not the situation here, where the social workers entered the Roskas' house not to inspect Rusty, but to remove him. Indeed, the record reveals that even though the social workers found that Rusty looked much healthier than they expected, they nonetheless proceeded with the removal.

only a warrantless search, but also the removal of a child from his parents. In such a case, the interest of the government in protecting the child must be balanced against the interest of the parents in keeping the family together. "Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." Santosky v. Kramer, 455 U.S. 745, 753 (1982). Measured against this parental interest, the state's interest in protecting children does not excuse social workers from the warrant requirement of the Fourth Amendment.

b.      Unreasonable Use of Force (Count 2)

Plaintiffs claim that Sneddon and Morrison violated Jessica Roska's and Maria Stewart's Fourth Amendment rights to be free of unreasonable use of force by pushing them against a wall. Before addressing an unreasonable use of force claim, we must examine the context in which the claim arises. Austin v. Hamilton, 945 F.2d 1155, 1158 (10th Cir. 1991) ("We must first place the objectionable events in this case somewhere along the custodial continuum running through initial arrest or seizure, post-arrest but pre-charge or pre-hearing custody, pretrial detention, and post-conviction incarceration; and then determine what constitutional protection controls at which particular juncture."), overruled on other grounds, Johnson v. Jones, 515 U.S. 304 (1995); see also Metcalf v. Long, 615 F. Supp. 1108, 1118-20 (D. Del. 1985) (noting that post-conviction

-14-

claims for excessive force are brought under the Eighth Amendment).

Claims that state actors used excessive force – deadly or not – in the course of a seizure are analyzed under the Fourth Amendment's reasonableness standard. Graham v. Connor, 490 U.S. 386, 395 (1989). Plaintiffs must show both that a "seizure" occurred and that the seizure was "unreasonable." Brower v. County of Inyo, 489 U.S. 593, 599 (1989). A person is seized within the meaning of the Fourth Amendment when "a reasonable person would believe that he or she is not 'free to leave.'" Florida v. Bostick, 501 U.S. 429, 435 (1991). Here, nothing indicates that Jessica Roska or Maria Stewart did not feel free to leave. Quite the contrary, Sneddon's alleged statement to "get the f**k out" indicates that they were encouraged to leave. Hence, we cannot say they were seized within the meaning of the Fourth Amendment.

A determination that plaintiffs were not seized within the meaning of the Fourth Amendment does not end the inquiry, however. Substantive due process analysis is appropriate in cases that involve excessive force where a specific constitutional provision – such as the Fourth or Eighth Amendment – does not apply. County of Sacramento v. Lewis, 523 U.S. 833, 843 (1998) ("Graham simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under

-15-

the rubric of substantive due process.' Substantive due process analysis is therefore inappropriate in this case only if respondents' claim is 'covered by' the Fourth Amendment.") (quoting United States v. Lanier, 520 U.S. 259, 272, n.7 (1997)). We therefore analyze plaintiffs' claim under the Fourteenth Amendment Due Process Clause.

The Fourteenth Amendment protects citizens against state actions that deprive them of life, liberty, or property without due process of law. U.S. CONST. amend. XIV. We examine three factors in determining whether force was excessive within the meaning of the Fourteenth Amendment: (1) the relationship between the amount of force used and the need presented; (2) the extent of the injury inflicted; and (3) the motives of the state actor. Hannula v. City of Lakewood, 907 F.2d 129, 131-32 (10th Cir. 1990). Force inspired by malice or by "unwise, excessive zeal amounting to an abuse of official power that shocks the conscience . . . may be redressed under [the Fourteenth Amendment]." Hewitt v. City of Truth or Consequences, 758 F.2d 1375, 1379 (10th Cir.1985). While we express some doubt as to the need to push or swear at adolescent girls, use of such force to move children who might be interfering with the removal of a child from the home is not so disproportionate as to rise to the level of a liberty violation within the meaning of the Due Process Clause. Additionally, no serious physical injury was inflicted, and "we have never upheld an excessive force claim

-16-

without some evidence of physical injury" outside of the context of a Fourth Amendment violation. Bella, 24 F.3d at 1257. Finally, nothing in the record indicates that the defendants were motivated by malice or other improper motive. [10] In sum, the facts alleged here fall short of the type of force that has been found to rise to the level of a due process violation. Compare Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553 (1st Cir.1989) (upholding a due process claim where four plain clothes police officers were conducting "preventive rounds" in search of drug traffickers and, with guns drawn, approached a young couple sitting in a car and, when the driver hastily started the engine and drove away, began shooting without warning and struck the driver in the back with one bullet, damaging his spinal cord and rendering him a paraplegic), with Bella, 24 F.3d 1251 (finding no due process violation where police officers allegedly shot at and struck plaintiff's helicopter while plaintiff unwillingly assisted in the escape of three inmates). The district court was correct in dismissing this count.

    c.    Warrantless Seizure of Rusty (Count 3)

Defendants clearly seized Rusty within the meaning of the Fourth

---

[10] We acknowledge that plaintiffs have alleged malicious prosecution and claim that defendants' seizure of Rusty had improper motivations. Nothing, however, indicates that the relevant plaintiffs were pushed by Sneddon as the result of a malicious motive.

Amendment, and defendants did so without a warrant and without exigent circumstances. Plaintiffs have therefore sufficiently alleged a violation of Rusty's Fourth Amendment right to be free from unreasonable seizures.

> d. Fourth Amendment Right to be Protected Against Child Abuse and Kidnapping (Count 4)

Plaintiffs assert that defendants violated Rusty's Fourth Amendment right to be protected against child abuse and kidnapping. We find no authority that suggests the existence of such a constitutional right, and we analyze this claim along with plaintiffs' more traditional due process and unreasonable seizure claims. To the extent that plaintiffs sought to assert a distinct Fourth Amendment violation for child abuse and kidnapping, the district court properly dismissed Count 4.

> e. Malicious Prosecution and Abuse of Process (Count 8)

Plaintiffs claim that defendant Morrison is liable for malicious prosecution and abuse of process. In this circuit, state law provides the starting point for a constitutional claim of malicious prosecution and abuse of process. Erikson v. Pawnee County Bd. of County Comm'rs, 263 F.3d 1151, 1154, 1155 n.5 (10th Cir. 2001). In Utah, malicious prosecution occurs when "(1) defendants initiated or procured the initiation of criminal proceedings against an innocent plaintiff; (2) defendants did not have probable cause to initiate the prosecution; (3)

-18-

defendants initiated the proceedings primarily for a purpose other than that of bringing an offender to justice; and (4) the proceedings terminated in favor of the accused." Hodges v. Gibson Prods. Co., 811 P.2d 151, 156 (Utah 1991). Here, Morrison did not initiate or procure the initiation of criminal proceedings. Therefore, there is no Fourth Amendment claim for malicious prosecution. [11]

Under Utah law, abuse of process claims require that legal proceedings be instituted "without probable cause, for the purpose of harassment or annoyance; and it is usually said to require malice." Baird v. Intermountain Sch. Fed. Credit Union, 555 P.2d 877, 878 (Utah 1976). Utah law has also defined the tort as using judicial resources "to accomplish some improper purpose, such as compelling its victim to do something which he would not otherwise be legally obliged to do." Crease v. Pleasant Grove City, 519 P.2d 888, 890 (Utah 1974). If the criminal process is used for its intended purpose, "the mere fact that it has some other collateral effect" does not render the action an abuse of process. Id.

_____

[11] Utah recognizes a similar tort for civil proceedings, called wrongful use of civil proceedings. Gilbert v. Ince, 981 P.2d 841, 845 (Utah 1999). Although no Utah case is on point, most jurisdictions include quasi-criminal proceedings in the latter tort. W. Page Keeton, et al., Prosser & Keeton on Torts 890 (5th ed. 1984). However, plaintiffs have not pled wrongful use of civil proceedings, and they do not argue it in their briefs. Neither an opposing party nor this court is under any obligation to craft legal theories for a plaintiff. See Abdelsamed v. United States, 2002 WL 462027, at *1 (10th Cir. 2000); see also Fed. R. Civ. Pro. 8(a) (requiring a short and plain statement of the grounds for relief). We therefore do not address a potential claim for wrongful use of civil proceedings.

Even actions motivated purely by spite will not support a claim if process is ultimately used only to accomplish the result for which it was created.    Prosser & Keeton at 897.

Morrison stated in her deposition that she did not believe Rusty's death was imminent and that she commenced the removal in part to create a type of controlled experiment to facilitate a diagnosis of MSBP.  However, no inference of an improper, ulterior purpose can be drawn from these statements.  Rather, these statements are wholly consistent with a concern for Rusty's health and an attempt to diagnose MSBP, even if Rusty's imminent death was not expected.  Because there is no evidence from which an inference can be drawn that Morrison used the judicial process to accomplish some improper purpose, we find that plaintiffs have not sufficiently alleged an abuse of process violation.

2.    *Fourteenth Amendment Claims*

The Fourteenth Amendment Due Process Clause provides that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend XIV, § 1.  Plaintiffs advance three theories in asserting a deprivation of their liberty interests without due process of law.

a.    Right to Maintain a Family Relationship (Count 5)

Plaintiffs contend that they were deprived of their liberty interest in their family relationship without due process of law when Rusty was removed without

notice or a hearing. Based on the pleadings and depositions, plaintiffs have sufficiently alleged a deprivation of a constitutional right.

In Santosky v. Kramer, the Supreme Court made clear that termination of parental rights impinges upon a liberty interest of which a citizen may not be deprived without due process of law. 455 U.S. 745, 753-54 (1982). Santosky dealt only with the proper standard of review and arose within the context of a permanent termination of parental rights. This circuit has applied Santosky's holding, however, to the temporary seizures of children and has held that notice and a hearing are required before a child is removed "'except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'" Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989) (quoting Smith v. Org. of Foster Families for Equal. & Reform, 431 U.S. 816, 848 (1977)). "Valid governmental interests" include "emergency circumstances which pose an immediate threat to the safety of a child." Hollingsworth v. Hill, 110 F.3d 733, 739 (10th Cir. 1997). As the Second Circuit has noted, the "mere possibility" of danger is not enough to justify a removal without appropriate process. Tenenbaum v. Williams, 193 F.3d 581, 594 (2d Cir. 1999).

As we discussed above, plaintiffs have pled sufficient facts to demonstrate that emergency circumstances did not exist to justify Rusty's immediate removal

from the home without notice or a hearing.  Defendants did not even attempt to obtain an _ex parte_ order.  We therefore find that plaintiffs have sufficiently alleged a violation of their Fourteenth Amendment procedural due process rights.

> b.      Right to be Safe From Harm While Being Held by the State (Count 6)

Plaintiffs claim that Rusty was deprived of his liberty interest in being safe from harm when the state placed him in a foster home that was unprepared to meet his needs and when he was given the wrong dose of methadone in the foster home.

States must ensure "reasonable care and safety" to persons within their custody.  _Youngberg v. Romeo_, 457 U.S. 307, 324 (1982).  This includes children in foster care.  _Yvonne L. v. N.M. Dep't of Human Servs._, 959 F.2d 883, 892 (10th Cir. 1992).  There are two circumstances in which the state may be liable for failing to ensure the safety of children in its care.  First, the state may be liable when a state actor shows "deliberate indifference to serious medical needs" of a child who is in state custody.  _Garcia v. Salt Lake County_, 768 F.2d 303, 307 (10th Cir. 1985).  Second, a state may be liable when state actors "place children in a foster home or institution that they know or suspect to be dangerous to the children," if harm actually occurs.  _Id._ at 893.

There are no allegations here that state actors showed deliberate

indifference to Rusty's health problems. [12] Plaintiffs allege only that defendants knew that the foster home in which Rusty was placed was not equipped to care for him. In support of this assertion, plaintiffs offer deposition testimony that the foster mother could not care for Rusty, that defendants had had a similar problem with children once before, and that Morrison was aware that Rusty was suffering and did nothing. However, a more thorough examination of the record reveals that the foster parents simply indicated that they would not be able to care for Rusty on a long-term basis, and that a child in a similar situation had been placed in a nursing home. [13] The district court was correct in dismissing the claim.

      c.      Right to Direct Children's Medical Care (Count 7)

Plaintiffs allege that the removal of Rusty and his placement in state care violated Connie and James Roska's rights to direct their son's medical care. In

---

[12] Plaintiffs do not name the foster parents as defendants, nor do they allege that any named defendant was involved in determining the methadone levels that Rusty received. Plaintiffs' allegations that defendants ignored Dr. Gooch's recommendation that Rusty remain with his family as part of his rehabilitation do not rise to the level of deliberate indifference.

[13] Plaintiffs alleged in their initial pleadings that Morrison was aware that Rusty was suffering in foster care. This could potentially qualify as "deliberate indifference." However, plaintiffs do not mention this in their briefs on appeal, and they direct us to no citation in the record in support of this contention. Without a specific reference, "we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury." Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1546 (10th Cir. 1995) (citing United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.")).

-23-

support of this contention, plaintiffs direct us to one case: In re J.P., 648 P.2d

1364 (Utah 1982). That case addressed a permanent termination of parental

rights. Id. at 1366 n.1. Plaintiffs point us to no authority or argument supporting

an extension of such a right to a temporary deprivation such as that suffered by

the Roskas. We also note that the Utah case cited by plaintiffs does not refer to a

Fourteenth Amendment right of parents to direct their child's medical care.

Rather, it simply notes that Utah law includes such a right among those that a

state may terminate upon an adequate showing of parental abuse or neglect.

Plaintiffs' briefing gives us no substantive argument as to what the scope of

such a right might be or how other interests should be balanced against such a

right. Perhaps most important, nothing in the record indicates that the state

sought to alter Rusty's medical program, other than an alleged inadvertent change

in his methadone dosage. Given the paucity of the plaintiffs' arguments and

evidence on this point, we cannot find that plaintiffs have made an adequate

showing of a deprivation of a constitutional right to direct Rusty's medical care. [14]

---

[14] We express no opinion on whether such a right might exist within the context of general familial rights. Cf. Santosky v. Kramer, 455 U.S. 745, 758-59 (1982) ("[A] natural parent's desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right.") (internal quotation marks omitted); Meyer v. Nebraska, 262 U.S. 390, 400-03 (1923) (holding that the Due Process Clause confers a right to direct a child's education). We simply state that plaintiffs have made neither an adequate argument nor a factual showing to support such a right on this record.

### 3. *Conclusion*

Having decided that the plaintiffs have adequately alleged that they suffered constitutional violations when the social workers entered their house without a warrant (Count 1), when they seized Rusty without a warrant (Count 3), and when they removed him without notice and a hearing (Count 5), we now consider whether the law was clearly established at the time the alleged violations occurred.

### C. Whether the Rights Were Clearly Established Such that a Reasonable Person Would Understand that Her Conduct Violated the Law.

"Despite their participation in this constitutionally impermissible conduct, the [defendants] may nevertheless be shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Hope, 122 S.Ct. at 2515 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Concerning the "clearly established law" requirement, the contours of the right must be sufficiently clear such that an objectively reasonable officer would understand that what she is doing violates that right. Anderson v. Creighton, 483 U.S. 635, 639-40 (1987). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." Harlow, 457 U.S. at 818-19 (emphasis added).

"Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained." Id. at 819. In other words, a civil rights defendant is "entitled to 'fair warning ' that his conduct deprived his victim of a constitutional right." Hope, 122 S.Ct. at 2515 (emphasis added). [15]

Thus, the touchstone of our inquiry is whether the "'officers [were] on notice [that] their conduct [was] unlawful.'" Id. (quoting Saucier, 533 U.S. at 206). Although the best indicium of "fair notice" is whether the law was clearly established at the time of the constitutional violation, Harlow makes clear that other factors may be relevant in determining the "objective reasonableness" of the state actor's conduct. 457 U.S. at 819.

1. *Whether the law was "clearly established."*

The law is clearly established when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains. Farmer v. Perrill , 288

---

[15] The Supreme Court has noted the analogue in criminal law: the void-for-vagueness doctrine. "[T]he qualified immunity test is simply the adaptation of the fair warning standard to give officials (and, ultimately, governments) the same protection from civil liability and its consequences that individuals have traditionally possessed in the face of vague criminal statutes." Hope, 122 S.Ct. at 2515 n.10.

F.3d 1254, 1259 (10th Cir. 2002). "Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." Hope, 122 S.Ct. at 2516. [16]

a. Plaintiffs' Fourth Amendment claims (Counts 1 and 3)

Our jurisprudence has long recognized that a person's privacy interest is at its highest in a person's home. "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Payton v. New York, 445 U.S. 573, 590 (1980); see also United States v. U.S. District Court, 407 U.S. 297, 313 (1972) ("[P]hysical entry into the home is the chief evil against which the . . . Fourth Amendment is directed . . . ."). Searches conducted without a warrant are per se unreasonable under the Fourth Amendment – subject only to a few "specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967) (footnotes omitted). This insistence upon interposing a "neutral and detached magistrate" between the state and the citizenry, subject to

---

[16] As we have previously recognized, a requirement of a case directly on point would quickly transform the qualified immunity standard into an absolute immunity standard in the vast majority of cases. Yvonne L. v. N.M. Dep't of Human Servs., 959 F.2d 883, 892 (10th Cir. 1992).

-27-

only a few exceptions justified by "exceptional circumstances," Johnson v. United States, 333 U.S. 10, 13-14 (1948), has become a "cardinal principle" of Fourth Amendment jurisprudence, Mincey v. Arizona, 437 U.S. 385, 390 (1978). [17] Further, the only situation in which the Supreme Court has extended the "special needs" doctrine to an individual's home occurred in Griffin, where the defendant was a probationer. See 483 U.S. 868 (1989); cf. Camara v. Municipal Court, 387 U.S. 523, 540 (1967) (holding that a warrant was needed to perform an administrative search upon private property). Consistent with these principles, in Franz v. Lytle, we held that police officers could not enter a house to investigate potential child abuse without a warrant. 997 F.2d 784, 791-92 (10th Cir. 1993); cf. Calabretta v. Floyd, 189 F.3d 808, 817 (9th Cir. 1999) (denying qualified immunity on similar facts); Good v. Dauphin County Social Servs., 891 F.2d 1087, 1094 (3d Cir. 1989) (same).

On the other hand, we have made certain statements, albeit in dicta, that could be construed as drawing distinctions between (1) child-abuse investigations and other types of investigations and (2) social workers and law-enforcement

---

[17] At least two cases involving the entry of social workers or police officers into a home to inspect or remove a child have upheld the warrant requirement. Good v. Dauphin County Soc. Servs., 891 F.2d 1087, 1093-94 (3d Cir. 1989); Calabretta v. Floyd, 189 F.3d 808, 813 (9th Cir. 1999) (decided after May 1999).

officers. [18] For example, in Snell v. Tunnell, in the context of a warrantless search of a house during a child-abuse investigation, we stated: "[W]e do not have occasion to decide whether a search of a private home without a warrant or probable cause violates the fourth amendment. Courts have reached differing results concerning the difficult issue of the scope of the fourth amendment protection in the context of a child abuse investigation." [19] 920 F.2d 673, 697 (10th Cir. 1990) (citations omitted). Further, in Franz, we suggested that the Fourth Amendment's strictures might apply differently to social workers:

> [A] social worker's principal focus is the welfare of the child. While a criminal prosecution may emanate from the social worker's activity, that prospect is not a part of the social worker's cachet. This distinction of focus justifies a more liberal view of the amount of probable cause that would support an administrative search.

997 F.2d at 791. [20] Taken together, Franz and Snell injected a degree of

---

[18] This latter distinction, of course, runs contrary to the general principle under which we focus on the function being performed by the state actor, rather than her particular job title, in conducting our immunity analysis.

[19] Subsequently, in Franz, we upheld the warrant requirement, although the defendant was a police officer rather than a social worker. 997 F.2d at 791-92 (holding that police officers could not enter a house to investigate potential child abuse without a warrant).

[20] Other statements in Franz alluded to the possibility of the special needs doctrine applying in the context of child-abuse investigations. See, e.g., Franz, 997 F.2d at 789 ("[Social workers] [might] be hindered in their investigations of alleged child abuse by a warrant or probable cause requirement."); id. at 791 ("'[S]pecial governmental needs, beyond the normal need for law enforcement . . . [could] provide[] the reasonableness component for the caseworker's conduct.'")

(continued...)

uncertainty into an otherwise staple rule of Fourth Amendment jurisprudence: absent exigent circumstances, the state may not enter an individual's home without a warrant. [21] Payton, 445 U.S. at 590. In other words, in light of these cases, "the constitutional question [regarding the warrant requirement] presented by this case is by no means open and shut." [22] Wilson v. Layne, 526 U.S. 603, 615 (1999).

Nevertheless, we cannot say that, in light of these cases, a reasonable state actor could conclude that the Fourth Amendment allowed a warrantless home entry and seizure of a child absent something approaching probable cause [23] to

---

[20](...continued) (citation omitted).

[21] In Snell, we noted that the circuits are split on the scope of a social worker's power to act without a warrant. 920 F.2d at 697. Our broad language notwithstanding, the circuits are split over the power of a social worker to inspect a child without a warrant, not over the power to enter a home without a warrant – thus implicating the strong constitutional right against unreasonable intrusions into the home – and remove a child without a warrant – thus implicating the parental right to keep the family together.

[22] Significantly, in Hidahl v. Gilpin County Department of Social Services, we granted qualified immunity to social workers who removed a child from a home without a warrant, without considering the constitutionality of the conduct in question. 938 F.2d 1150, 1153 (10th Cir. 1991).

[23] Lest this statement be taken out of context, based on our earlier discussion in section II(B)(1), *supra*, henceforth, the law is now clearly established that, absent probable cause and a warrant or exigent circumstances, social workers may not enter an individual's home for the purpose of taking a child into protective custody.

believe that: (1) the child's health or safety was at risk, [24] and (2) this risk was due to the child's presence in the home . In this case, however, the district court specifically concluded that:

> [A]n objective, reasonable state social worker could have reasonably believed, based on the information the DCFS defendants possessed at the time of removal, that there was substantial cause to believe that there was a substantial danger to Rusty's health or safety and that Rusty's health or safety could not be protected without removing him from his parents' custody.

Dist. Ct. Order at 20 (emphasis added). The district court went on to conclude that "there was substantial cause to believe that Rusty's presence in his own home was the reason for his particularly troubling and persistent condition of being restrained to a wheelchair and having to be fed through an intravenous tube even though he was not physically handicapped." Dist. Ct. Order at 21 (emphasis added). The record in this case supports the district court's findings. [25]

Accordingly, based on these findings, we hold that defendants' warrantless entry

---

[24] We recognize that immediate risk to safety would give rise to "exigent circumstances." Anderson, 981 F.2d at 1567 (exigent circumstances not present unless there is an "immediate need to protect [the officer's lives or [the lives of] others"). In this case, however, as we discussed supra, even though the defendants reasonably concluded that Rusty's health was at risk, the risk was not immediate. Accordingly, the exigent circumstances exception to the warrant requirement under the Fourth Amendment is inapplicable.

[25] We realize that the district court made these findings in the context of determining whether defendants complied with Utah Code Ann. § 78-3a-301. Nevertheless, section 78-3a-301's "substantial cause" requirement is sufficiently similar to the standard articulated herein for the district court's findings to support our conclusion.

and seizure did not violate clearly established law under the Fourth Amendment as it stood on May 28, 1999.

      b.     Plaintiffs' Fourteenth Amendment claim (Count 5)

In <u>Malik v. Arapahoe County Dep't of Soc. Servs.</u>, we held "that it [is] clearly established law that, except in extraordinary circumstances, a parent has a liberty interest in familial association and privacy that cannot be violated without adequate pre-deprivation procedures." 191 F.3d 1306, 1315 (10th Cir. 1999) (citations omitted).[26] In this case, defendants afforded the Roskas <u>no process</u> prior to removing Rusty. Defendants did not even attempt to obtain an <u>ex parte</u> order. Further, defendants point to no extraordinary circumstances that would justify the complete absence of pre-deprivation procedural safeguards. Although "emergency circumstances which pose an immediate threat to the safety of a child" might justify the absence of pre-deprivation procedures, <u>Hollingsworth</u>, 110 F.3d at 739, in this case, Rusty's health and safety were not in immediate danger. Thus, regarding plaintiffs' claim under the Fourteenth Amendment, clearly established law plainly put defendants on notice that their conduct violated the Constitution.

      c.     Summary

---

[26] Significantly, one of the defendants in <u>Malik</u> was a social worker. <u>See</u> 191 F.3d at 1310.

Based on the foregoing, we conclude that defendants' warrantless entry and seizure did not violate clearly established law under the Fourth Amendment as it stood on May 28, 1999; thus, defendants are entitled to qualified immunity on plaintiffs' claim alleging warrantless entry and seizure. On the other hand, defendants' conduct did violate clearly established law under the Fourteenth Amendment as of May 29, 1999. Accordingly, we proceed to consider the objective legal reasonableness of defendants' conduct in light of clearly established law under the Fourteenth Amendment.

2. *Whether a reasonable state actor would have understood the conduct in question to be violative of the Constitution.*

The next step in the analysis is to consider the "'objective legal reasonableness' of the [state actor's] action[s], assessed in light of the legal rules that were 'clearly established' at the time it was taken." Anderson, 483 U.S. at 639 (emphasis added) (citations omitted). Once the district court determines that the right at issue was "clearly established," it becomes defendant's burden to prove that her conduct was nonetheless objectively reasonable. Cannon v. City & County of Denver, 998 F.2d 867, 874 (10th Cir. 1993).

In considering the "reasonable state actor," we must keep in mind that qualified immunity precludes the imposition of liability for "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S.

-33-

335, 341 (1986) (emphasis added). Where "officers of reasonable competence could disagree on th[e] issue, immunity should be recognized." Id. at 341.

At the same time, where the right is clearly established, a defendant should only "rarely" be able to succeed with a qualified immunity defense. [27] V-1 Oil Co. v. Wyoming Department of Environmental Quality, 902 F.2d 1482, 1488 (10th Cir. 1990). "The circumstances must be such that the defendant was so 'prevented' from knowing that his actions were unconstitutional that he should not be imputed with knowledge of a clearly established right." Cannon, 998 F.2d at 874 ( citation and footnote omitted).

The objective legal reasonableness of the officer's actions is a legal question. Sharrar v. Felsing, 128 F.3d 810, 828 (3d Cir. 1997). But where the "historical facts material to [that] issue are in dispute [there] . . . [is] an issue for the jury." [28] Id.

---

[27] As we noted in Cannon v. City & County of Denver, "officials are [generally] held to have constructive knowledge of established law." 998 F.2d 867, 874 n.6 (10th Cir. 1993) (citation omitted).

[28] As the Fifth Circuit has noted:

It must be recognized that even though [Hunter v. Bryant, 502 U.S. 224 (1991)] diminished the jury's role in qualified immunity cases, it did not entirely abolish it. Rule 56 still has vitality in qualified immunity cases if the underlying historical facts in dispute . . . are material to the resolution of the questions whether the defendants acted in an objectively reasonable manner in view of the existing law and facts available to them.

(continued...)

-34-

a.     Reliance on a statute

In considering the "objective legal reasonableness" of the state officer's actions, one relevant factor is whether the defendant relied on a state statute, regulation, or official policy that explicitly sanctioned the conduct in question. [29] See Wilson, 526 U.S. at 617; Lederman v. United States, 291 F.3d 36, 47 (D.C. Cir. 2002); Grossman v. City of Portland, 33 F.3d 1200, 1209-10 & n.20 (9th Cir.

_____

[28](...continued)

Lampkin v. City of Nacogdoches, 7 F.3d 430, 435 (5th Cir. 1993) (citation omitted).

[29] As the Ninth Circuit noted, when Chief Justice Warren first articulated this principle, it was in the context of the subjective test that preceded Harlow. Grossman, 33 F.3d at 1209 (citing Pierson v. Ray, 386 U.S. 547 (1967)). The court, however, went on to note the principle's continuing viability:

> Even though the Supreme Court subsequently replaced the subjective "good-faith" qualified immunity standard applied in Pierson with an objective "reasonableness" inquiry, courts have continued to adhere to the central principle enunciated in that case: where a police officer has probable cause to arrest someone under a statute that a reasonable officer could believe is constitutional, the officer will be immune from liability even if the statute is later held to be unconstitutional.

Id. (citations and footnotes omitted). Later in its opinion, the court further elaborated on the rationale for this principle: "[W]hen a city council has duly enacted an ordinance, police officers on the street are ordinarily entitled to rely on the assumption that the council members have considered the views of legal counsel and concluded that the ordinance is a valid and constitutional exercise of authority." Id.

-35-

1994) (citing cases); <u>Malachowski v. City of Keene</u>, 787 F.2d 704, 713-14 (1st Cir. 1986); <u>see</u> <u>generally</u> 1B M ARTIN A. S CHWARTZ & J OHN E. K IRKLIN , S ECTION 1983 L ITIGATION : C LAIMS AND D EFENSES § 9.19 (1997 & Supp. 2003). Of course, an officer's reliance on an authorizing statute does not render the conduct per se reasonable. [30] <u>Cf.</u> <u>Malley</u>, 475 U.S. at 345-46 (fact that officer applied for a warrant based on facts he believed to be true does not render conduct per se "objectively reasonable"). Rather, "the existence of a statute or ordinance authorizing particular conduct is a factor which militates in favor of the conclusion that a reasonable official would find that conduct constitutional." <u>Grossman</u>, 33 F.3d at 1209.

In this case, the district court concluded that defendants were entitled to qualified immunity, based on defendants' reliance on Utah Code Ann. § 78-3a-301. We disagree. Section 78-3a-301 does not authorize removal absent pre-deprivation procedures. Thus, reliance on section 78-3a-301 alone could not render the defendants' conduct objectively reasonable, insofar as the statute did not authorize the unconstitutional conduct in question.

The defendants, however, in their petition for rehearing, urge us to consider

_____

[30] For example, "[w]here a statute authorizes official conduct which is patently violative of fundamental constitutional principles, an officer who enforces that statute is not entitled to qualified immunity." <u>Grossman</u>, 33 F.3d at 1209.

the effect of Utah Code Ann. §§ 62A-4a-202.1 and 62A-4a-202.2 on the qualified immunity analysis in this case. Section 62A-4a-202.2 provides only for post-deprivation measures in child removals made pursuant to section 62A-4a-202.1. Defendants contend that they were acting pursuant to §§ 62A-4a-202.1 and 62A-4a-202.2 when they committed the constitutional violations in question.

We decline petitioners' invitation for two reasons. First, the district court did not rely on either provision in finding qualified immunity; thus, the more prudent course is to allow the district court to consider the effect of the two statutes in the first instance. Cf. S.E.C. v. Cochran, 214 F.3d 1261, 1269 (10th Cir. 2000). Second, in light of the nature of the inquiry, it would be impossible to consider the question on the record before us.

On this latter point, we make the following observations. First, the presence of a statute is not relevant to the question of whether the law is "clearly established." Cf. V-1 Oil, 902 F.2d at 1488 n.5 (recognizing that we should not "refer to legal advice the defendant received when we decide whether or not the governing law was clearly established"). Rather, a state officer's reliance on a statute is one factor to consider in determining whether the officer's actions were objectively reasonable, Wilson, 526 U.S. at 617, keeping in mind that the overarching inquiry is one of "fair notice," Hope, 122 S.Ct. at 2515.

Second, in considering the relevance of a statute under a qualified-

immunity analysis, the appropriate inquiry is not whether a reasonable state officer could have concluded that the statute authorized the unconstitutional conduct in question. Rather, a court must consider whether reliance on the statute rendered the officer's conduct "objectively reasonable," considering such factors as: (1) the degree of specificity with which the statute authorized the conduct in question; (2) whether the officer in fact complied with the statute; [31] (3) whether the statute has fallen into desuetude;[32] and (4) whether the officer could have reasonably concluded that the statute was constitutional. [33]

Based on the above, we reverse the district court's conclusion, insofar as it

---

[31] In this case, removal pursuant to section 62A-4a-202.1 required that three conditions be met: (1) the services caseworker must have "substantial cause to believe that any of the factors described in Section 78-3a-301 exist"; (2) there are no other "services reasonably available . . . which, if provided to the minor's parent or to the minor, would eliminate the need to remove the minor from the custody of his parent"; and (3) the services caseworker must be accompanied by a peace officer, unless one is not reasonably available. Utah Code Ann. § 62A-4a-202.1. We leave it to the district court on remand to consider whether defendants in fact relied on Utah Code §§ 62A-4a-202.1 and 202.2 (as opposed to section 78-3a-301), and whether defendants complied with the statutory provisions (recognizing that the district court's findings under section 78-3a-301 likely address this question, at least in part).

[32] The Ninth Circuit in Grossman highlighted this consideration: "We do not deal here with an ordinance which has fallen into desuetude. An officer enforcing such an enactment is not necessarily entitled to rely on the assumption that it continues to be consistent with the current state of constitutional law." 33 F.3d at 1209 n.19.

[33] As we noted earlier, where a statute authorizes conduct that is "patently violative of fundamental constitutional principles," reliance on the statute does not immunize the officer's conduct. See Grossman, 33 F.3d at 1209.

-38-

relied solely on Utah Code Ann. § 78-3a-301. On remand, the district court may consider the effect of Utah Code Ann. §§ 62A-4a-202.1 and 62A-4a-202.2 on defendants' claimed entitlement to qualified immunity, in accordance with the preceding.

b.      Advice of counsel

In <u>V-1 Oil</u>, we held that "reliance on the advice of counsel in certain circumstances [can] rise[] to the level of extraordinary circumstances" sufficient to justify a grant of qualified immunity. 902 F.2d at 1488. "Whether reliance upon legal advice 'bars our imputation to [the defendant] of constructive knowledge concerning the laws allegedly violated by his conduct' depends upon the circumstances of each case." <u>Id.</u> at 1489 (citation omitted). Relevant factors include: (1) how unequivocal and specific the advice was; (2) how complete the information provided to the attorney giving the advice was; (3) the prominence and competence of the attorney; and (4) the time between the dispersal of the advice and the action taken. <u>Id.</u>

In <u>V1-Oil</u>, we granted the state officer qualified immunity, concluding that the officer's reliance on advice of counsel "prevented [him] . . . from knowing the relevant legal standard," even though the relevant Fourth Amendment principle was "clearly established." <u>Id.</u> at 1488-89. Specifically, we stated:

> We hold that a reasonable officer in [defendant's] position – that is, an officer who conducts a warrantless search on the same day he was

advised by fully informed, high-ranking government attorneys that a particular statute, which had not yet been tested in any court, lawfully authorized that particular search – should not be expected to have known that the search was unconstitutional.

Id. at 1489.

In this case, the district court alternatively concluded that the defendants were entitled to qualified immunity based on their reliance on advice of counsel. For the reasons set forth below, we reverse and remand.

First, the district court again based its decision on Utah Code § 78-3a-301,[34] which, as discussed supra, does not authorize removal without pre-deprivation procedures.[35] Second, based on the record before us, we cannot determine whether the district court was correct in concluding that Petersen's advice related specifically to the conduct in question:[36] removing Rusty from his home without any pre-deprivation procedures. Finally, although the district court concluded that the advice "was specifically tailored to the facts giving rise to this

---

[34] According to the district court's opinion, "[Defendant] Peterson, an assistant Utah attorney general representing DCFS in the child protection division, . . . advised [Morrison and Sneddon] that it would be lawful to remove Rusty based on the information they possessed[,]. . . bas[ing] his opinion on Utah Code Ann. § 78-3a-301." Dist. Ct. Order at 3.

[35] Although defendants now claim that Peterson's advice was also based on Utah Code §§ 62A-4a-202.1 and 62A-4a-202.2, again, we think it best to allow the district court to consider this question in the first instance.

[36] See Dist. Ct. Order at 26.

-40-

controversy," [37] neither the district court opinion nor the record indicate the specific facts upon which Defendant Peterson relied in approving removal.

### III. Conclusion

In summary, we hold that plaintiffs have adequately alleged that defendants violated their constitutional rights under the Fourteenth Amendment when, in the absence of extraordinary circumstances, they entered the Roskas' house and removed Rusty from his parents' custody and care without notice and a hearing (Count 5). We hold that the district court was correct in granting defendants' motion for summary judgment on the remainder of the plaintiffs' claims.

On remand the district court should first determine which defendants are still properly joined in the matter before proceeding further. The district court must then determine whether the defendants are entitled to qualified immunity on Count 5.

We conclude by noting, as we did in <u>Franz</u>, that "[w]e must further underscore the defendant's motive to protect the child . . . does not vitiate plaintiffs' [constitutional] rights. That motive, however, may enter the calculus of the damages, if any, that his actions justify." 997 F.2d at 793.

This case is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

---

[37] <u>See</u> Dist. Ct. Order at 26 .