**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 6 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JOAN LAWRENCE,

        Plaintiff-Appellant,

   v.

MIKE REED, Rawlins Police Chief in
his official and individual capacities,

        Defendant-Appellee.

No. 04-8030

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. NO. 03-CV-74-J)**

---

Bruce T. Moats, Law Offices of Bruce T. Moats, P.C., Cheyenne, Wyoming, for
Plaintiff-Appellant.

Craig E. Kirkwood, Senior Assistant Attorney General (Patrick J. Crank,
Wyoming Attorney General and John W. Renneisen, Deputy Attorney General,
with him on the brief) Office of the Wyoming Attorney General, Cheyenne,
Wyoming, for Defendant-Appellee.

---

Before **BRISCOE**, **HARTZ**, and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

Defendant Mike Reed, the chief of police in Rawlins, Wyoming, seized over 70 derelict vehicles from the property of Joan Lawrence, the plaintiff in this case. Mrs. Lawrence sued Mr. Reed (along with the city and the mayor), alleging violations of her Fourth Amendment right against unreasonable seizures and her Fourteenth Amendment right to due process. The district court found that Mr. Reed had violated Mrs. Lawrence's clearly established rights under the Fourth and Fourteenth Amendments, but it held Mr. Reed immune from suit because his consultation with the city attorney constituted "extraordinary circumstances" preventing him from knowing the clearly established law. Mrs. Lawrence has since settled with the city and the mayor, and she now appeals the district court's grant of immunity to Mr. Reed.

On appeal, Mr. Reed concedes that he violated Mrs. Lawrence's clearly established constitutional rights. The only question, then, is whether he should be held immune from suit because of his consultation with the city attorney or, alternatively, because of his reliance on the Rawlins derelict vehicle ordinance. On the basis of these two circumstances, Mr. Reed argues that a reasonable officer in his position should not have known that his conduct was unlawful. We disagree and therefore REVERSE the district court's dismissal of Mrs. Lawrence's claim and remand for further proceedings.

I.

Mrs. Lawrence owns a salvage yard in Rawlins, Wyoming. The yard sits atop a hill south of Spruce Street. Between the hill and Spruce Street lies another piece of property, also owned by Mrs. Lawrence. Part of that property (the part next to the salvage yard) is zoned industrial; the rest, which fronts Spruce Street, is zoned residential. Prior to the events giving rise to this suit, Mrs. Lawrence stored an assortment of vehicles and scrap metal not only in the salvage yard, but also on the industrial and residential portions of her land.

Across the street from Mrs. Lawrence lies the Carbon County Fairground, home of the renowned Carbon County Fair and Rodeo (over 75 years running).[1] Apparently, fair-goers found the derelict vehicles unsightly and complained to the city council. The council, ever responsive to its constituents, convened a meeting.

Many meetings, in fact. Mrs. Lawrence's vehicles had been a source of contention since at least 1982, when the city sought to enjoin the late Mr. Lawrence from storing derelict vehicles on the very same property. Mr. Lawrence and the city entered a Settlement Agreement, according to which Mr. Lawrence

---

[1] Slated for the 2002 Fair were barrel racing and roping competitions; horse and dog shows; sheep, swine, and beef showmanship clinics; a dairy milk-out; a beauty pageant; pie, cake, and chili cooking contests; and a demolition derby. http://w3.trib.com/~rcccoc/fair.htm (last visited February 15, 2005).

relinquished any claim of right to store derelict vehicles on certain portions of his property, including at least some of the land between the salvage yard and Spruce Street. The parties disagree about whether Mr. Lawrence retained the right to store derelict vehicles on the industrially zoned portion of the property.

Confronted with the sight of derelict vehicles and the rapidly approaching August 2002 fair, the city council considered two options. Either it could go to court and enforce the 1982 Settlement Agreement, or it could remove the vehicles pursuant to the derelict vehicle ordinance. The former would involve ponderous judicial proceedings, adversarial hearings before an impartial magistrate and the like; the latter provided a streamlined process for seizing and junking derelict vehicles, broadly defined. No hearings, no warrants—just a warning letter one month beforehand, a few tags on the vehicles the day before, and then the city could enter Mrs. Lawrence's property and seize whatever vehicles arguably appeared to be derelict.[2]

_____

[2] A derelict vehicle is any vehicle that is: "(1) Inoperable to the extent that it is unable to perform its original intended function; (2) Partially or wholly dismantled; (3) Wrecked to the extent that prevents legal operation; (4) Junked or intended to be recycled or scrapped." Rawlins Municipal Code § 8.20.020(B).

The derelict vehicle ordinance prohibits any property owner from "allow[ing] or permit[ting] any derelict vehicle to remain unsheltered on such property for more than thirty days," and makes the property owner responsible for the removal of any such vehicle. *Id.* § 8.20.040(A). Excepted from this prohibition are "vehicle[s] on the premises of a business enterprise operated in a lawful place and manner when necessary to the operation of the business

(continued...)

-4-

The city opted for simple seizure. City Attorney Lewis sent Mrs. Lawrence a letter on February 26, 2002, notifying her that her vehicles violated the derelict vehicle ordinance and had to be removed within thirty days. Mrs. Lawrence then met with the city attorney and asked for more time, based on her need to undergo eye surgery and the anticipated construction of a road to transport the vehicles from the Spruce Street property up the hill to the salvage yard. City Attorney Lewis relented.

But the problem flared up again in August 2002. By that time the Carbon County Fair and Rodeo was in full swing and the complaints of fair-goers were rolling in. The city council addressed the issue at its August 6 meeting. Shortly thereafter, City Attorney Lewis sent another letter to Mrs. Lawrence, August 9, 2002, warning her that the vehicles had to be moved within thirty days or else the city would remove them at Mrs. Lawrence's expense.

Meanwhile, Police Chief Reed met with the city attorney and city manager to discuss how to enforce the derelict vehicle ordinance. They discussed the 30-day notice process, the 24-hour tagging requirement, and the removal of the

---

[2](...continued)
enterprise." *Id.* § 8.20.040(C).

Once a vehicle "is reasonably determined to be derelict"—by whom, the ordinance does not say—and once the city has given thirty-days' notice, the city may place on the vehicle a notice of intent to impound. *Id.* § 8.20.070(B). Twenty-four hours later, the city may remove the vehicle. *Id.*

vehicles. When Mrs. Lawrence failed to respond to the August 9 letter, Mr. Reed tagged her vehicles on October 7, 2002. That night, Mrs. Lawrence and a helper moved all but a few vehicles from the residentially zoned property fronting Spruce Street to the industrially zoned property behind. Based on the 1982 Settlement Agreement, Mrs. Lawrence believed she had the right to store the vehicles there.

When Mr. Reed arrived the next morning to begin the removal operation, he noticed that Mrs. Lawrence had moved the vehicles. Out of an abundance of caution, he consulted the city attorney once more. He recalls that it was "[j]ust a discussion as to whether to proceed or not proceed, and a decision to proceed was made." Over the next several days, the city towed over 70 of Mrs. Lawrence's vehicles to its landfill.

Mrs. Lawrence then initiated this suit under 42 U.S.C. § 1983. She alleged that Mr. Reed (along with the city and the mayor) violated her Fourth and Fourteenth Amendment rights by seizing her property without a warrant or a hearing. The district court denied the summary judgment motions of the city and mayor, but granted Mr. Reed's motion on the ground that he was immune from suit. Mrs. Lawrence has since settled with the city and mayor, and now appeals the district court's grant of summary judgment for Mr. Reed. We review the

district court's decision de novo. *Reynolds v. Powell*, 370 F.3d 1028, 1031 (10th Cir. 2004).

II.

42 U.S.C. § 1983 provides that "[e]very person" who acts under color of state law to deprive another of constitutional rights "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." Although this statute "on its face admits of no immunities," *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976), the Supreme Court has recognized several, including the doctrine of qualified immunity, which exempts government officials from suits for civil damages under certain circumstances. This grant of immunity is intended to balance two concerns. On one hand, when an official abuses his office, "an action for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982). On the other hand, exposing government officials to damages suits "entail[s] substantial social costs," *Anderson v. Creighton*, 483 U.S. 635, 638 (1987), such as "the expenses of litigation, the diversion of official energy from pressing public issues, . . . the deterrence of able citizens from acceptance of public office . . . [and the deterrence of public officials from] 'the unflinching discharge of their duties.'" *Harlow*, 457 U.S. at 814.

The Supreme Court has attempted to strike the balance between these two concerns by shielding government officials from suits for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818. Although courts have derived from this statement a variety of multi-part tests, the essential inquiry is: would an objectively reasonable official have known that his conduct was unlawful? *See Anderson*, 483 U.S. at 640. In the Tenth Circuit, we employ a three-step inquiry. *See Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1239-40, 1247, 1251 (10th Cir. 2003). First, we ask "whether the plaintiff's allegations, if true, establish a constitutional violation." *Id.* at 1239-40. If not, the suit is dismissed; if so, we move to the second step: "whether the law was clearly established at the time the alleged violations occurred." *Id.* at 1247. This step gives the official an opportunity to show that he "neither knew nor should have known of the relevant legal standard" because the law was not clearly established at the time he acted. *Harlow*, 457 U.S. at 819. Where the law is not clearly established, courts do not require officials to anticipate its future developments, and qualified immunity is therefore appropriate.

If the law was clearly established, we reach the third step of the inquiry: whether, in spite of the fact that the law was clearly established, "extraordinary circumstances"—such as reliance on the advice of counsel or on a statute—"so

'prevented' [the official] from knowing that his actions were unconstitutional that he should not be imputed with knowledge of a clearly established right." *Roska*, 328 F.3d at 1251. This occurs only "rarely." *Id.*

Mr. Reed has not challenged the district court's finding that he violated Mrs. Lawrence's Fourth and Fourteenth Amendment rights and that these rights were clearly established at the time he acted. On the Fourth Amendment issue, the district court found that neither exigent circumstances nor special needs justified the warrantless seizure of Mrs. Lawrence's vehicles, and that therefore the seizure was unreasonable. Dist. Ct. Op. at 29-30. On the due process issue, the court found that the derelict vehicle ordinance violated due process because it allowed the city to deprive Mrs. Lawrence of her property without a hearing. *Id.* at 30-32. We take these findings as a given because Mr. Reed does not challenge them.

The only question on appeal, then, is whether "extraordinary circumstances" excused Mr. Reed from knowing the clearly established law. Mr. Reed points to two reasons why he neither knew nor should have known that the seizure of Mrs. Lawrence's vehicles violated clearly established law: his consultation with the city attorney, and his reliance on the derelict vehicle ordinance.

A.

In some cases consultation with an attorney can create the extraordinary circumstances that excuse a violation of clearly established law. *V-1 Oil Co. v. State of Wyo., Dept. of Environmental Quality*, 902 F.2d 1482, 1488 (10th Cir. 1990). "Of course, such [consultation] is not inherently extraordinary, for few things in government are more common than the receipt of legal advice." *Id.* Instead, as noted above, the question is whether the consultation "so 'prevented' [the official] from knowing that his actions were unconstitutional that he should not be imputed with knowledge of a clearly established right." *Roska*, 328 F.3d at 1251. When evaluating such a claim, we look to the totality of the circumstances, including such factors as: "[1] how unequivocal, and specifically tailored to the particular facts giving rise to the controversy, the advice was, [2] whether complete information had been provided to the advising attorney(s), [3] the prominence and competence of the attorney(s), and [4] how soon after the advice was received the disputed action was taken." *V-1 Oil*, 902 F.2d at 1489 (internal citations omitted). These four factors are not the only relevant circumstances.

In this case, we find particularly significant the fact that Mr. Reed and City Attorney Lewis never once discussed the applicable constitutional law governing Mr. Reed's conduct. Mr. Reed concedes that a warrant or notice-and-hearing are required before depriving a citizen of their property; he also concedes that these constitutional requirements were clearly established and that he violated them.

Yet he now argues that his consultation with the city attorney—who never once mentioned the requirement of a warrant or notice-and-hearing—somehow prevented him from knowing that these procedures were constitutionally required. This cannot be the case. What Mr. Reed really wants us to conclude is that it is generally reasonable to rely on the city attorney's advice—that it is the attorney's job, not the police officer's, to point out when a statutorily authorized course of conduct violates the Constitution. But this is an argument that officers should not be held responsible for knowing the law in the first place, *not* that consultation with the city attorney somehow interfered with that knowledge. Given Mr. Reed's concession that his conduct violated Mrs. Lawrence's clearly established rights, and given the Supreme Court's admonishment that "a reasonably competent public official should know the law governing his conduct," *Harlow*, 457 U.S. at 819, Mr. Reed must point to something in his consultation with the city attorney that prevented him from knowing the law. This he has not done. The district court therefore erred by granting Mr. Reed immunity on the basis of his consultation with the city attorney. *Accord Roska*, 328 F.3d at 1254 (reversing the district court's grant of immunity based on attorney consultation because "we cannot determine whether . . . [the attorney's] advice related specifically to the conduct in question: removing [the plaintiff] from his home without any pre-deprivation procedures.").

-11-

B.

Alternatively, Mr. Reed argues that he should not be held responsible for knowing the unlawfulness of his conduct because his conduct was authorized by the Rawlins derelict vehicle ordinance. We have recognized that an officer's "reli[ance] on a state statute, regulation, or official policy that explicitly sanctioned the conduct in question" may absolve the officer from knowing that his conduct was unlawful.[3] *Roska*, 328 F.3d at 1251-52. This reflects the sensible notion that officers should be able to "rel[y] on the legislature's determination that a statute is constitutional." *Grossman v. City of Portland*, 33 F.3d 1200, 1210 (9th Cir. 1994). Of course, this principle is not without limit—we have also said that "where a statute authorizes conduct that is 'patently violative of fundamental constitutional principles,' reliance on the statute does not immunize the officer's conduct." *Roska*, 328 F.3d at 1253 n. 33, quoting *Grossman*, 33 F.3d at 1209. Thus, officers can rely on statutes that authorize their conduct—but not if the statute is obviously unconstitutional. Again, the

---

[3] We have even listed a few factors to help us determine when reliance on a statute is reasonable: "(1) the degree of specificity with which the statute authorized the conduct in question; (2) whether the officer in fact complied with the statute; (3) whether the statute has fallen into desuetude; and (4) whether the officer could have reasonably concluded that the statute was constitutional." *Roska*, 328 F.3d at 1253.

-12-

overarching inquiry is whether, in spite of the existence of the statute, a reasonable officer should have known that his conduct was unlawful.

1.

Mrs. Lawrence presents a strong argument that the derelict vehicle ordinance did not authorize Mr. Reed's conduct. She maintains that the 1982 Settlement Agreement between her husband and the city reserved her the right to store derelict vehicles on the industrially zoned portion of her property. Although the Agreement specifically required the late Mr. Lawrence to remove the vehicles from the *residentially* zoned portion of his property, it makes no mention of the industrially zoned property next to the salvage yard. The implication, Mrs. Lawrence argues, is that she retains the right to store vehicles on that portion of her property, and the derelict vehicle ordinance does not apply.

There is some evidence that the city shared Mrs. Lawrence's view of the Settlement Agreement. A memorandum from Ron Kilgore, a city development director in charge of code enforcement, states that "Mrs. Lawrence was informed by this Department that numerous junk cars on her property . . . were located on residentially zoned property and needed to be relocated to the industrially zoned property to the south." Aplt's App. 54. A memorandum from Paul Wawrziniack, a building official, to Paul Drinkhouse, the city manager, confirms this

-13-

understanding of the agreement. All of this suggests that the derelict vehicle ordinance did not apply.

We are not concerned, however, simply with whether or not the derelict vehicle ordinance applied, but with whether or not a reasonable officer would conclude that it applied. Just as we do not require officials to predict novel constitutional rulings, we do not require them to predict novel statutory rulings. Instead, the focus of the qualified immunity inquiry is on what a reasonable officer should have known. Here, Mrs. Lawrence concedes that the derelict vehicle ordinance applies on its face to her property; but she argues that the 1982 Settlement Agreement carved out an exception for her industrially zoned property. What she has failed to produce, however, is any evidence that Mr. Reed knew or should have known about the 1982 Settlement Agreement. Absent such evidence, we cannot conclude that the agreement rendered unreasonable Mr. Reed's conclusion that the derelict vehicle ordinance authorized his conduct.

2.

But this does not end our inquiry. Another important consideration is whether Mr. Reed could reasonably have concluded that the statute was constitutional. As we noted above, officers are not always entitled to rely on the legislature's judgment that a statute is constitutional: "where a statute authorizes conduct that is 'patently violative of fundamental constitutional principles,'

reliance on the statute does not immunize the officer's conduct." *Roska*, 328 F.3d at 1253 n. 33, quoting *Grossman*, 33 F.3d at 1209. This means that some statutes are so obviously unconstitutional that we will require officials to second-guess the legislature and refuse to enforce an unconstitutional statute—or face a suit for damages if they don't. The question is whether Mr. Reed's enforcement of the derelict vehicle ordinance is such a case.

We think it is. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Time and again, the Supreme Court has made clear that "some form of hearing is required before an individual is finally deprived of a property interest." *Id.* And although the Court has crafted a nice balancing test to determine what such a hearing should look like,[4] we need not consider that test here because the Rawlins derelict vehicle ordinance provides no hearing whatsoever.

This is precisely why Mr. Reed should have known that the ordinance was unconstitutional. Had the derelict vehicle ordinance provided some form of pre- or post-deprivation hearing—even a constitutionally inadequate one—we would

---

[4] *Mathews* requires a balancing of (1) the private interest affected by official action, (2) the risk of an erroneous deprivation and the value of additional procedural safeguards, and (3) the government's interest and the burdens of additional procedural requirements. 424 U.S. at 335.

not necessarily expect a reasonable officer to know that it was unconstitutional. For once the ordinance provides a hearing, its constitutionality turns on a court's resolution of the *Mathews* balancing test, which, in the absence of case law directly on point, is not something we would require officers to predict. Here, however, the ordinance provides no hearing whatsoever; an officer need not understand the niceties of *Mathews* to know that it is unconstitutional. Our decisions, and those of other circuits, have made abundantly clear that when the state deprives an individual of property—for example, by impounding an individual's vehicle—it must provide the individual with notice and a hearing. *See Summers v. State of Utah*, 927 F.2d 1165, 1169 (10th Cir. 1991) (owner of impounded vehicle must receive a hearing); *Propert v. District of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991) (same); *Draper v. Coombs*, 792 F.2d 915, 923 (9th Cir. 1986) (ordinance authorizing towing but providing no hearing violates due process); *Huemmer v. Mayor and City Council of Ocean City*, 632 F.2d 371, 372 (4th Cir. 1980) (ordinance is "manifestly defective" when it provides no hearing). This is especially true where, as here, the state not only impounds the vehicles but permanently disposes of them. *Cf. Propert* 948 F.2d at 1332.

In sum, a hearing is "[t]he fundamental requirement of due process," *Mathews*, 424 U.S. at 333, and the Rawlins derelict vehicle ordinance does not even pretend to provide one. This is a sufficiently obvious constitutional

violation that Mr. Reed should have known about. Mr. Reed, therefore, was not entitled to rely on the ordinance, and qualified immunity is inappropriate. *Accord Wong v. City & County of Honolulu*, 333 F.Supp.2d 942, 957-58 (D. Haw. 2004) (officer not entitled to rely on a statute authorizing impoundment and destruction of derelict vehicles without notice or a hearing).

## III.

Mr. Reed relies heavily, and not without reason, on our decision in *V-1 Oil Co. v. State of Wyo., Dept. of Environmental Quality*, 902 F.2d 1482 (10th Cir. 1990), and a word is in order on why that case does not control here. In *V-1 Oil*, the defendant, an official of the Wyoming Department of Environmental Quality, conducted a warrantless search of a V-1 Oil station in Lander, Wyoming. The defendant noticed workers removing the concrete above the station's underground gasoline storage tanks, and he became concerned that the station, a known source of groundwater pollution, was engaged in unlawful conduct. After twice being refused permission to enter the property, the defendant consulted a senior assistant attorney general. The attorney sought a court order authorizing an inspection of the premises, but was unable to obtain one because no judge was available. He then advised the defendant that the Wyoming Environmental Quality Act authorized a warrantless search of the station. Later that night, the defendant, along with a policeman and the Lander City Attorney, entered the

premises, inspected the underground tanks, and took a soil sample from the exposed area.

Although we concluded that this search violated V-1 Oil's clearly established constitutional rights, we found the defendant immune from suit based on his consultation with the assistant attorney general and his reliance on the Wyoming Environmental Quality Act. We held that:

> [A] reasonable officer in [the defendant's] position—that is, an officer who conducts a warrantless search on the same day he was advised by fully informed, high-ranking government attorneys that a particular statute, which had not yet been tested in any court, lawfully authorized that particular search—should not be expected to have known that the search was unconstitutional.

*Id.* at 1489. Mr. Reed argues that his case is analogous: he conducted a warrantless seizure on the same day he was advised by the city attorney that a previously unchallenged ordinance authorized his conduct.

We, however, conclude that *V-1 Oil* is distinguishable. True, Mr. Reed, like the defendant in *V-1 Oil*, consulted with an attorney who told him that a previously unchallenged statute authorized his conduct. But two important factors underlying the grant of immunity in *V-1 Oil* are absent here. First, this case lacks the urgency that was present in *V-1 Oil*, where, we have said, the attorney's advice was "required to be acted on immediately." *Cannon v. City and County of Denver*, 998 F.2d 867, 876 (10th Cir. 1993). In *V-1 Oil*, any delay in

-18-

acting on the attorney's advice—by, for example, waiting until the following morning to find a judge who could issue a court order authorizing the search—risked the loss of potentially valuable evidence of an ongoing regulatory violation. Thus, we gave proportionally greater weight to the officer's reliance on advice of counsel where circumstances demanded a snap decision in the face of uncertainty. Here, by contrast, there was no urgency, as Mr. and Mrs. Lawrence and the City of Rawlins had been wrangling over the same derelict vehicles for over two decades.

A second reason for distinguishing *V-1 Oil* is the difference in the relied-upon statutes. As we noted above, officers are not entitled to rely on statutes they should know are unconstitutional. And this is precisely where *V-1 Oil* and the present case diverge: although both cases involve reliance on an unconstitutional statute, the unconstitutionality of the statute in *V-1 Oil* was a close call, whereas the unconstitutionality of the Rawlins derelict vehicle ordinance is obvious.

As an initial matter, the constitutional inquiry in *V-1 Oil* was substantially more complex than it is here. There, the relevant statute was the Wyoming Environmental Quality Act, and the constitutional question was whether the act fit within an exception to the warrant requirement for "pervasively regulated businesses." Resolution of this constitutional question required a multi-stage inquiry. First, the Court had to determine whether V-1 Oil was part of a

pervasively regulated industry, taking into account the various federal, state, and local regulations governing gasoline dealers, and comparing those regulations to the regulatory regimes in other industries. *V-1 Oil*, 902 F.2d at 1486. After concluding that V-1 Oil was, in fact, a pervasively regulated industry, the Court had to determine whether the authorized inspection was "reasonable," applying the three-part test of *New York v. Burger*, 482 U.S. 691 (1987). The most important part of this test, the Court found, was the requirement that the statute "provide[] a constitutionally adequate substitute for a search warrant," *V-1 Oil*, 902 F.2d at 1486, which means that the statute (1) "must be sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes," and (2) "must be carefully limited in time, place, and scope." *Id.* at 1485-86 (internal quotations omitted), quoting *Burger*, 482 U.S. at 702-03. After a fairly detailed statutory analysis, the Court concluded that the statute was not "sufficiently comprehensive and defined" to provide a constitutionally adequate substitute for a warrant, and was therefore unconstitutional. *See id.* at 1487.

The question then becomes, should the officer in *V-1 Oil* have known that the Wyoming Environmental Quality Act was unconstitutional? We thought not. We do not expect even reasonable officers to conduct and resolve complicated,

multi-part constitutional tests. And that is precisely what was required in *V-1 Oil*. An officer confronting the constitutional issue in *V-1 Oil* would have to wade through several layers of multi-part inquiries before he even reached the dispositive standards. Once he reached those standards (Is the statute "sufficiently comprehensive and defined," and is it "carefully limited in time, place, and scope"?), he would find that they were much more difficult to apply than a bright-line rule. Finally, even if the officer knew how to apply those standards, he would find that the facts of *V-1 Oil* presented a close case—indeed, we and the district court disagreed on the ultimate resolution of the constitutional issue. Under these circumstances, it would be too much to expect the officer to know that the statute was unconstitutional.

The constitutional inquiry in Mr. Reed's case, by contrast, is markedly simpler. Does the statute deprive an individual of a protected property interest? If so, does the statute provide a hearing? In the context of the Rawlins derelict vehicle ordinance, these are not difficult questions and they yield a clear result. It is therefore not too much to expect Mr. Reed to know that the ordinance was unconstitutional.

IV.

In spite of the layers of complexity built up around the doctrine of qualified immunity, the fundamental inquiry is fairly simple: should the officer have known

-21-

that his conduct was unlawful?  For the reasons set forth above, we find that Mr. Reed should have known that his conduct was unlawful, and we therefore REVERSE the district court's grant of immunity and its dismissal of Mrs. Lawrence's claims, and REMAND for further proceedings.

04-8030, *Lawrence v. Reed*

**HARTZ**, Circuit Judge, dissenting:

I respectfully dissent. The Supreme Court opinion providing for qualified immunity in "extraordinary circumstances" despite the violation of clearly established law, *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982), gives little guidance on what circumstances are "extraordinary." The majority may well have construed the term correctly. But the very concerns expressed in *Harlow* suggest to me that Sheriff Reed is entitled to qualified immunity.

Recognition of qualified immunity balances the interest in vindicating the rights of a victim injured by a violation of law against the "social costs" of suits against government officials: "the expenses of litigation, the diversion of official energy from pressing public issues, . . . the deterrence of able citizens from acceptance of public office, [and] the danger that fear of being sued will 'dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.'" *Id*. at 814 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (L. Hand, J.)) (second brackets in original).

Before *Harlow,* qualified immunity was unavailable if the official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff, or if he took

the action with the malicious intention to cause a deprivation of constitutional rights or other injury." *Id.* at 815 (internal emphasis, brackets, and quotation marks omitted). But requiring proof of the subjective element of this defense "frequently ha[d] proved incompatible with [the] admonition . . . that insubstantial claims should not proceed to trial." *Id*. at 815-16. The official's subjective good faith was a question of fact that ordinarily could not be resolved by summary judgment. *Id*. at 816. Not only did officials therefore have to bear the burden of trial, but also the issue could justify searching, burdensome discovery of the official's thought processes. *Id*. at 816-17.

To ease these burdens *Harlow* held "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id*. at 818. "Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law," the Court explained, "should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Id*.

Thus, the purpose of the objective clearly-established-law test was to act as a shield to protect public servants from litigation, not as a sword to impose liability on them. The Court recognized, however, that the clearly-established-

law test also can serve as the standard for imposing liability. The traditional qualified-immunity test had denied immunity when the official knew or reasonably should have known that the action was unlawful, *id*. at 815; and the Court observed that "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id*. at 818-19. At this point the Court introduced the exception to the clearly-established-law test that we grapple with in this case: "Nevertheless," it said, "if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors." *Id*. at 819.

It seems to me that the meaning of *extraordinary circumstances* must be examined in light of the policies underlying the *Harlow* decision. The policy behind *Harlow's* objective test was to permit prompt termination of litigation that is unlikely to succeed. Overly strict application of that test, however, could undermine the policy of protecting reasonably competent public officials from litigation. Given the complexities of the law today, it should not be surprising to find intelligent, conscientious, well-trained public servants who do not know all the clearly established law governing their conduct. The statement in *Harlow* that

reasonably competent public officials know clearly established law, *id*. at 818-19, is a legal fiction.

Nevertheless, the objective test, and the legal fiction it embraces, can advance the policies behind qualified immunity if the extraordinary-circumstances exception is properly understood. The extraordinary-circumstances exception should encompass those situations in which the legal fiction does not make sense and applying that fiction would create problems that qualified immunity is intended to avert. In my view, this goal can be advanced by including as an extraordinary circumstance the official's reliance on specific advice by a nonsubordinate attorney of sufficient stature regarding the specific challenged action. Although, as I previously stated, it is doubtful that reasonably competent public officials actually know all the clearly established law governing their conduct, it is largely true that reasonably competent public officials are sufficiently versed in the law that they know not to take certain actions without seeking proper legal advice. If they violate clearly established law without having sought legal advice, holding them liable makes good sense. But there is little sense in holding officials liable for unlawful action that received the imprimatur of properly sought legal advice. The *Harlow* legal fiction should not be extended to say that reasonably competent public officials know when the legal advice they receive is contrary to clearly established law.

Moreover, to extend the legal fiction that far would undermine a critical purpose of qualified immunity—reducing "the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible public officials, in the unflinching discharge of their duties." *Id*. at 814 (internal quotation marks and brackets omitted). Surely public policy favors the practice of public officials seeking legal advice regarding questionable practices. Is it wise to hold those officials liable when they follow that advice? When the proper discharge of the official's duties requires action, do we want the official to flinch in acting—because of fear of litigation—even after counsel advises that the action is lawful? Thus, in my view, incorrect legal advice is an extraordinary circumstance cloaking an official with qualified immunity when, as here, it comes from the highest level nonsubordinate attorney with whom the official is to consult and the attorney is fully informed of the planned action and the surrounding circumstances.

As I understand them, this court's precedents are consistent with this view. We have recognized four considerations in determining whether reliance on counsel constitutes extraordinary circumstances: "[1] how unequivocal, and specifically tailored to the particular facts giving rise to the controversy, the advice was, [2] whether complete information had been provided to the advising attorney(s), [3] the prominence and competence of the attorney(s), and [4] how

-5-

soon after the advice was received the disputed action was taken." *V-1 Oil Co. v. Wyo. Dep't of Envtl. Quality*, 902 F.2d 1482, 1489 (10th Cir. 1990) (internal citations and footnotes omitted). The relevance of the first two considerations is obvious: the official is not entitled to rely on advice unless the official has provided the attorney with all relevant information and the advice authorizes the specific action taken by the official.

The third and fourth factors—the stature of the attorney and the time to take action—are interrelated. One should seek the best possible legal advice that time allows. For example, if immediate action is required, there may be time to consult with only an assistant city attorney; if the assistant has expertise on the applicable law, it may be appropriate to rely on the assistant's advice. I would reject Ms. Lawrence's argument on appeal that the extraordinary-circumstances test cannot apply here because there was no need for Chief Reed to act immediately. Chief Reed consulted with the City Attorney. What was the Chief to do with the extra time—go to the law library to check whether the City Attorney had misread the cases?

I disagree with the majority's reading of our precedents as requiring the public official to discuss the pertinent law with the advising lawyer. In the real world—not the world of legal fictions—officials, even the most competent of them, go to counsel with an idea of what they want to do and inquire whether

-6-

there is some law (constitutional, statutory, regulatory, or case-based) that prohibits or restricts them from doing so. The attorney does not need the official's legal advice or argument to reach a conclusion. What is important is whether the official provides all relevant information concerning both the problem and the intended course of conduct.

I suspect that the greatest hurdle for Chief Reed is the Supreme Court's use of the term "*extraordinary* circumstances" in delineating this exception to the clearly-established-law rule. How can one view the seeking of legal advice as *extraordinary*? Public officials do it, and should do it, all the time. It truly is an *extraordinary* circumstance, however, when a public official is prevented from knowing a clearly established legal proposition because the official is misdirected by a fully informed chief counsel. It certainly appears that reported cases are rare.

Perhaps some may fear the possibility of collusion between the public official and the government attorney, with the official seeking a free pass from the attorney for conduct they both know to be unlawful. This fear of collusion is one reason why reliance on advice from private counsel that conduct is lawful is not a defense to crime under the Model Penal Code § 2.04 and in almost every jurisdiction. *See* 1 Wayne R. LaFave, *Substantive Criminal Law* § 5.6(e)(4) (2d ed. 2003). On the other hand, the Model Penal Code § 2.04(3)(b)(iv) recognizes a

defense for reasonable reliance on "an official interpretation of the public officer or body [who undoubtedly relied on government counsel] charged by law with responsibility for the interpretation, administration or enforcement of the law defining the offense."  And surely the risk of collusion is less when turning to a nonsubordinate government attorney than when relying on a private attorney paid by the person seeking clearance.  Moreover, the government attorney who may be tempted to shield a public official from liability would likely be deterred by the risk of his or her own liability in authorizing a specific unlawful act despite being fully informed of the circumstances.

In the present case Sheriff Reed fully informed the City Attorney of the relevant surrounding circumstances and how he intended to proceed.  The City Attorney gave his imprimatur.  It would be contrary to *Harlow's* underlying concern about "dampen[ing] the ardor of all but the most resolute, or the most irresponsible public officials, in the unflinching discharge of their duties," 457 U.S. at 814, to tell officials like the sheriff that they cannot rely on their chief nonsubordinate government attorneys but must postpone action (to conduct their own research or call a professor at the nearest law school?) or risk being sued.

I would affirm the judgment below.