MURPHY, Circuit Judge.
I. Introduction
Plaintiffs-Appellees Connie and James Roska brought suit under 42 U.S.C. § 1983 against Defendants-Appellants Melinda Sneddon, Shirley Morrison, and Colleen Lasater. Plaintiffs allege that Defendants’ removal of their son, Rusty Roska, from their home without a warrant or pre-deprivation hearing violated their Fourth and Fourteenth Amendment rights. The district court initially granted Defendants’ motion for summary judgment on qualified immunity. This court reversed in part, holding that Plaintiffs had sufficiently alleged a violation of their clearly established constitutional right to maintain a family relationship. The case was remanded to the district court to consider whether Defendants’ reliance on Utah Code Ann. §§ 62A-4a-202.1 and -202.2 or the advice of counsel made their conduct nonetheless objectively reasonable and thus entitled them to qualified immunity. Roska ex rel Roska v. Peterson, 328 F.3d 1230, 1253-54 (10th Cir.2003) [hereinafter Roska /]. On remand, the district court denied Defendants’ motion for summary judgment on qualified immunity and granted Plaintiffs’ motion for summary judgment on liability. Defendants appealed. This court has jurisdiction pursuant to 28 U.S.C. § 1291 and Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Because Defendants failed to comply with the statute on which they base their qualified immunity claim, Defendants’ conduct was not objectively reasonable. Thus, we affirm.
II. Background
On May 26, 1999, Davis County School District employees met with Melinda Sneddon, a caseworker for the Utah Department of Child and Family Services (“DCFS”), to discuss allegations of possible medical neglect of twelve-year-old Rusty Roska. School employees noted Rusty’s declining health, and expressed concern that Rusty might die if DCFS did not. intervene. They informed Sneddon that when Connie Roska, Rusty’s mother, dropped him off at school the. week before, he looked ill and pale, was sweating profusely, and was wearing a parka in seventy-degree weather. When a school nurse asked Mrs. Roska about Rusty’s health, Mrs. Roska stated that Rusty was suffering from kidney failure. Concerned, the nurse called Rusty’s main treating physician, Dr. Judith Gooch, .who assured her Rusty was not in kidney failure. School employees also informed Sneddon of occasions when Mrs. Roska told school employees Rusty had parasites in his intestines, a hole in his esophagus, and a disease that afflicts only a few people worldwide. Additionally, Sneddon was told that Rusty’s healthy appendix had been removed at Mrs. Roska’s insistence.[1]
• Sneddon assigned Shirley Morrison, another DCFS caseworker, to investigate Rusty’s case. Morrison reviewed Rusty’s records, including information on an April 1998 DCFS investigation into allegations that Mrs. Roska suffered from Munchau-sen Syndrome by Proxy (“MSBP”). MSBP is a disorder in which an individual, *968 usually a mother, inflicts physical harm upon a child to gain the sympathy and attention of medical personnel. John B. Murray, Munchausen Syndrome/Munchausen Syndrome by Proxy, 131 J. Psychol. 343, 343-44, 346-47 (1997). The prior DCFS investigation concluded that the allegations of MSBP were unsubstantiated.
Morrison also contacted several of Rusty’s physicians, including Dr. Brian Evans and Dr. Michael Joseph. When Morrison informed the physicians she was investigating Mrs. Roska for MSBP, both stated something to the effect that it was about time someone discovered what was going on with Rusty. Additionally, Dr. Evans informed Morrison of a 1998 investigation by Primary Children’s Medical Center in Salt Lake City that was unable to confirm MSBP. Dr. Joseph, who treated Rusty at the UCLA Children’s Hospital Pain Clinic in November 1998, stated that he had developed a treatment plan for Rusty when he left the Clinic, but that after initial compliance, Mr. and Mrs. Ros-ka failed to follow through. Morrison attempted to contact Dr. Judith Gooch, Rusty’s main treating physician, but was unable to reach her. The next day, Dr. Gooch either spoke to Morrison or left her a voice mail message stating that Rusty’s case was complicated and she would prefer they make an appointment to discuss the case in-person. Dr. Gooch had not been told there was an emergency or that removal of Rusty was being considered.
Morrison also spoke to Dr. Brenda Bursch, an expert in MSBP who treated Rusty at the UCLA Pain Clinic. Dr. Bursch informed Morrison that she had suspected MSBP, but could not document any behavior that lead to the conclusion that MSBP was being committed after careful observation of the family at UCLA. That same day, Morrison and Sneddon met with Craig Peterson, an Assistant Attorney General of Utah, to discuss Rusty’s case. Peterson informed them that the information Morrison had gathered was legally sufficient to support removal of Rusty from his home without a warrant. Thereafter, although Morrison did not believe Rusty was in imminent danger of death, Morrison, Sneddon, and a police officer went to the Roskas’ home to remove Rusty. While they were at the home, Dr. Gooch spoke to Sneddon on the telephone. Sneddon stated Dr. Gooch informed her that removing Rusty would inhibit Mrs. Roska’s progress in attending appointments, and may destroy “this family emotionally and Rusty may never recover.” Dr. Gooch testified that she told Sneddon, “it would be harmful, it would be bad for them, it would be bad for Rusty, bad for his family to remove him from the home.” Dr. Gooch would neither confirm nor deny MSBP. After speaking with Dr. Gooch, Sneddon called her supervisor, Colleen Lasater, who advised her to continue with the removal. Rusty was taken into protective custody and placed in foster care.
At a shelter hearing six days after the removal, the juvenile court ruled that Rusty should remain in protective custody. The next day, however, the juvenile court received additional evidence at a hearing for a temporary restraining order. At this second hearing, the juvenile court released Rusty to his parents’ custody, but ordered extensive DCFS supervision.
Rusty Roska, his parents, and his siblings brought suit under 42 U.S.C. § 1983, alleging various rights deprivations under the Fourth and Fourteenth Amendments as a result of Rusty’s removal.[2] The dis *969 trict court granted Defendants’ motion for summary judgment on qualified immunity and dismissed the suit. On appeal, this court affirmed in part and reversed in part. Roska I, 328 F.3d at 1254. Relevant to this appeal, we determined that Plaintiffs sufficiently alleged a violation of their clearly established constitutional right to maintain a family relationship. Id. at 1245-46, 1250. This court further considered whether Defendants demonstrated their conduct was nonetheless objectively reasonable in light of their reliance on Utah child protection statutes and the advice of counsel. Id. at 1251-54. This court rejected the district court’s conclusion that Defendants were entitled to qualified immunity based on Utah Code Ann. § 78-3a-301 because that statute does not authorize removal without pre-deprivation procedures. Id. at 1252. We remanded the case, however, for the district court to consider whether Defendants’ reliance on Utah Code Ann. §§ 62A-4a-202.1 and -202.2, which provide for removal without a warrant or pre-deprivation hearing, or reliance on the advice of counsel rendered Defendants’ conduct objectively reasonable such that they are entitled to qualified immunity. Id. at 1253-54.
On remand, the district court entertained cross-motions for summary judgment. The district court concluded Defendants were not entitled to qualified immunity as to the claims asserted by Mr. and Mrs. Roska because their conduct was not objectively reasonable. Roska v. Sneddon, 311 F.Supp.2d 1307, 1316-17 (D.Utah 2004). Specifically, the district court concluded that while Defendants did rely on Utah Code Ann. §§ 62A-4a-202.1 and -202.2, they did not actually comply with the statute and could not reasonably have concluded that their noncompliance was constitutional. Id. at 1313-16. Moreover, the district court reasoned Defendants were not entitled to rely on the advice of counsel because Peterson did not know of Dr. Gooch’s opposition to removal when he advised Defendants that removal was proper. Id. at 1316-17. The district court thus denied Defendants’ motion for summary judgment on qualified immunity and granted Plaintiffs’ motion for summary judgment on liability. Id. at 1318.
Defendants do not contest the district court’s conclusion that they are not entitled to qualified immunity based on their reliance on the advice of counsel. Therefore, we do not address this issue on appeal.
III. Discussion
A. Local Rule
As a preliminary matter, Defendants claim the district court erred in granting Plaintiffs’ motion for summary judgment because Plaintiffs failed to comply with local rule D. Utah Civ. R. 56-l(b). D. Utah Civ. R. 56-1 (b) provides that a memorandum in support of a motion for summary judgment “must ... contain! ] a concise statement of material facts as to which movant contends no genuine issue exists.” Moreover, “[t]he facts must be numbered and refer with particularity to those portions of the record on which movant relies.” D. Utah Civ. R. 56-l(b). Because we lack appellate jurisdiction over the district court’s grant of summary judgment to Plaintiffs, we do not address Defendants’ argument.
Under 28 U.S.C. § 1291, this court only has appellate jurisdiction over “final decisions” of district courts. This finality requirement “precludes consideration of decisions that are subject to revision, and even of fully consummated decisions [that] are but steps towards final judgment in which they will merge.” Behrens v. Pelletier, 516 U.S. 299, 305, 116 *970 S.Ct. 834, 133 L.Ed.2d 773 (1996) (quotation omitted). Nevertheless, under the “collateral order” doctrine, some district court orders are considered “final” even though they are entered before a case has been fully resolved. See, e.g., Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 145-46, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) (Eleventh Amendment immunity); Mitchell, 472 U.S. at 530, 105 S.Ct. 2806 (denial of qualified immunity); Abney v. United States, 431 U.S. 651, 662, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) (double jeopardy). The collateral order doctrine, however, does not apply to Defendants’ assertion that Plaintiffs failed to comply with a local rule. Plaintiffs moved for summary judgment on the issue of liability.[3] Although the district court granted the motion, the issue of causation and damages is still to be decided. “[A]n order that determines liability but leaves damages to be calculated is not final,” unless the calculation of damages is merely ministerial. Albright v. UNUM Life Ins. Co., 59 F.3d 1089, 1092-93 (10th Cir.1995) (quotation omitted). Because further proceedings are necessary to determine causation and the amount of damages, if any, the district court’s order is not final and the grant of Plaintiffs’ motion is not immediately appealable.
Nevertheless, this court has discretion to exercise pendent appellate jurisdiction over nonappealable issues once we have asserted jurisdiction over other appealable issues in the same case. Garrett v. Stratman, 254 F.3d 946, 953 n. 9 (10th Cir.2001). It is appropriate to exercise pendent appellate jurisdiction “where the otherwise nonappealable decision is inextricably intertwined with the appealable decision, or where review of the nonap-pealable decision is necessary to ensure meaningful review of the appealable one.” Moore v. City of Wynnewood, 57 F.3d 924, 930 (10th Cir.1995) (quotations omitted). A nonappealable decision is inextricably intertwined with an appealable one if resolution of the appealable decision necessarily resolves the nonappealable issue as well. Id. The exercise of pendent jurisdiction, however, “is generally disfavored.” Id. at 929.
Although we have jurisdiction over Defendants’ appeal from the district court’s denial of their motion for summary judgment on qualified immunity, we decline to assert pendent appellate jurisdiction over Defendants’ claim that the district court failed to apply a local rule. The two issues are not inextricably intertwined and it is not necessary for us to reach Defendants’ local-rule argument or even the underlying grant of summary judgment to Plaintiffs to fully examine the appropriateness of the district court’s denial of qualified immunity.
B. Reliance on Statute
Defendants claim the district court erred in denying their motion for summary judgment on qualified immunity because Defendants’ reliance on Utah Code Ann. §§ 62A-4a-202.1 and -202.2 made their conduct objectively reasonable. *971 A denial of qualified immunity is immediately appealable if the district court’s decision turns on an issue of law. Mitchell, 472 U.S. at 530, 105 S.Ct. 2806. When there are no relevant historical facts in dispute, the objective reasonableness of an official’s actions is a legal question. Roska I, 328 F.3d at 1251. Here, the district court determined no relevant material facts are in dispute, and the parties do not contest this conclusion. Thus, the district court’s denial of summary judgment is properly before this court on interlocutory appeal. We review a district court’s denial of summary judgment based on qualified immunity de novo. Perez v. Ellington, 421 F.3d 1128, 1131 (10th Cir.2005).
When a defendant raises a claim of qualified immunity, the burden shifts to the plaintiff to show the defendant is not entitled to immunity. Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir.2001). To overcome a qualified immunity defense, a plaintiff must first establish a violation of a constitutional or statutory right and then show that the right was clearly established. Garramone v. Romo, 94 F.3d 1446, 1449 (10th Cir.1996). Plaintiffs have already met this burden. In Roska I, this court held that Defendants’ removal of Rusty without a warrant or pre-deprivation hearing deprived Plaintiffs of their clearly established constitutional right to maintain a family relationship. 328 F.3d at 1245-46, 1250.
Usually, if the law is clearly established at the time of defendant’s conduct, a qualified immunity defense will fail. Harlow v. Fitzgerald, 457 U.S. 800, 818-19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). “Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained.” Id. at 819, 102 S.Ct. 2727. Reliance on a state statute is one extraordinary circumstance which may render an official’s conduct objectively reasonable. Roska I, 328 F.3d at 1251-52. Reliance on a statute does not, however, make an official’s conduct per se reasonable. Id. at 1252. Rather, it is one factor “which militates in favor of the conclusion that a reasonable official would find that conduct constitutional.” Id. (quotation omitted). Relevant factors in determining whether reliance on a statute rendered an official’s conduct objectively reasonable include: (1) the degree of specificity with which the statute authorized the conduct; (2) whether the official in fact complied with the statute; (3) whether the statute has fallen into desuetude; and (4) whether the official could have reasonably concluded the statute was constitutional. Id. at 1253. Defendants bear the burden of proving their conduct was objectively reasonable in light of a state statute. Id. at 1251.
Utah Code Ann. § 62A-4a-202.1 (1998)[4] authorized DCFS to take a child into protective custody without obtaining a warrant if: (1) a caseworker had substantial cause to believe any of the factors in Utah Code Ann. § 78-3a-301 existed, and (2) the caseworker provided the child’s parents or child with services that would eliminate the need for removal, if those services were reasonably available and consistent with the child’s safety and welfare. Utah Code Ann. § 62A-4a-202.2 provided for post-deprivation procedures *972 that had to be in place before DCFS could remove a child without a warrant pursuant to Utah Code Ann. § 62A-4a-202.1. The parties agree that these statutory provisions had not fallen into desuetude at the time of Defendants’ actions.
Further, Defendants could have reasonably concluded the statute was constitutional. When a legislature has enacted a statute, officials “are ordinarily entitled to rely on the assumption that the [legislature has] considered the views of legal counsel and concluded that the [statute] is a valid and constitutional exercise of authority.” Grossman v. City of Portland, 33 F.3d 1200, 1209 (9th Cir.1994). When a statute authorizes conduct that patently violates the Constitution, however, officials are not entitled to turn a blind eye to its obvious unconstitutionality and then claim immunity based on the statute. Id.
The statute in this case was not patently unconstitutional. We recognize that there are some governmental interests which, when weighed against a parent’s liberty interest in maintaining a family relationship, justify postponing due process. Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir.1989). The safety and welfare of children is one such governmental interest. Malik v. Arapahoe County Dep’t of Soc. Servs., 191 F.3d 1306, 1315 (10th Cir.1999). Although there must be extraordinary circumstances to justify postponing due process, Defendants were entitled to rely on the assumption that the Utah legislature took these requirements into account when drafting the statute. Specifically, the statute required both danger to the child and reasonable efforts to eliminate the need for removal before a child could be placed in protective custody without a warrant. Utah Code Ann. § 62A-4a-202.1. Moreover, the statute required certain post-deprivation procedures to be in place before a child was removed. Utah Code Ann. § 62A-4a-202.2. It was thus reasonable for Defendants to conclude that the statute was a constitutional balancing of the government’s interest in protecting children with a parent’s constitutional right to maintain a family relationship. See Malachowski v. City of Keene, 787 F.2d 704, 714 (1st Cir.1986) (holding officer could rely on state statute allowing him to take child into custody when, without immediate action, her welfare would be in danger because officer could have reasonably concluded statute was constitutional). Additionally, the child protection statute that existed at the time of Rusty’s removal was enacted in 1994 in response to a federal civil rights lawsuit against DCFS and its constitutionality had not been challenged. Therefore, it was reasonable for Defendants to conclude Utah Code Ann. §§ 62A-4a-202.1 and -202.2 were constitutional.
Nevertheless, Defendants failed to actually comply with the statute on which they rely. Utah Code Ann. § 62A-4a-202.1(2)(b) provided:
If possible, consistent with the child’s safety and welfare, before taking a child into protective custody, the [caseworker] shall also determine whether there are services reasonably available to the worker which, if provided to the minor’s parent or to the minor, would eliminate the need to remove the minor.... In determining whether services are reasonably available, and in making reasonable efforts to provide those services, the child’s health, safety, and welfare shall be the worker’s paramount concern.
This provision was not a mere technicality. Rather, it recognized the important statutory “presumption that it is in the best interest and welfare of a child to be raised under the care and supervision of his natural parents.” Utah Code Ann. § 62A-4a- *973 201(1). Moreover, it sought to achieve a balancing of the government’s interest in protecting children with the constitutional “right of parents to conceive and raise their children.”[5] Id.
Defendants concede they did not provide preventive services to the Roskas. They argue, however, that they complied with the statute because they considered preventive services and determined they were not appropriate. Defendants offer several reasons why their failure to provide services was reasonable.
Defendants first argue that because Rusty’s parents failed to follow through with services in the past, specifically the treatment plan developed at the UCLA Pain Clinic, it was reasonable to believe they would not comply in the future. The record, however, is devoid of any indication that DCFS services were offered to the Roskas in the past.[6] Even if the Roskas failed to follow through with the UCLA treatment plan, it does not necessarily follow that they would therefore reject DCFS services. Although both the UCLA treatment plan and DCFS preventive services are voluntary, failure to comply with DCFS services carries greater consequences because it could result in removal of Rusty from the home and possibly loss of permanent custody. Moreover, Defendants had information from Dr. Gooch that Mrs. Roska was doing a better job of keeping her appointments. This statement undermines Defendants’ contention that they reasonably believed Rusty’s parents would not comply with DCFS services.
Defendants next argue that because the cause of Rusty’s ailments was unknown, it would have been difficult to devise appropriate services. Defendants, however, came to this conclusion without talking to Dr. Gooch, Rusty’s main treating physician, about his condition. Further, the treatment plan developed for Rusty at the UCLA Pain Clinic had proven effective in *974 the past. Therefore, the record does not support Defendants’ argument.
Finally, Defendants claim that allegations of Rusty’s parents contributing to or facilitating his illness made it unlikely that preventive services would be successful. They argue that if Mrs. Roska was suffering from MSBP, she may have incentive to prove Rusty really was sick when confronted with allegations that she was causing his illness. Three prior investigations into allegations of MSBP, by DCFS, Primary Children’s Medical Center, and Dr. Bursch, however, revealed that the charges could not be substantiated. DCFS therefore should have made services available to prevent the need for immediate removal and then, if the Roskas rejected or failed to comply with them, or if DCFS’s further supervision revealed evidence of MSBP, DCFS could have removed Rusty at that time.
In addition to the explanations offered by Defendants, the dissent argues it was reasonable to remove Rusty without providing preventive services because of the serious nature of the alleged abuse. Dissenting Op. at 980-81. The dissent notes that MSBP is “ ‘one of the more dangerous forms of abuse’ ” with a “ ‘substantial risk of morbidity and even mortality.’ ” Dissenting Op. at 980, 981. The dissent’s suggestion that Rusty’s health and safety were in immediate danger because of possible MSBP, however, is belied by our previous opinion in this case. This court previously held that no emergency circumstances existed to justify removal without due process because “Rusty’s health and safety were not in immediate danger.” Roska I, 328 F.3d at 1250 (emphasis added).[7]
*975 There may be circumstances in which a child is in such immediate danger that preventive services are not appropriate. The statute allowed for that possibility by stressing that in determining whether services are reasonably available, the child’s health, safety, and welfare are of paramount concern. Utah Code Ann. § 62A-4a-202.1(2)(b); see also Utah Code Ann. § 62A-4a-202(l)(a). In this case, however, Rusty’s health and safety were not in immediate danger. Moreover, Defendants had information from Dr. Gooch suggesting that removal might harm Rusty more than keeping him at home. In light of these circumstances, Defendants’ failure to provide the Roskas with preventive services to eliminate the need for removal was not reasonable. Therefore, Defendants did not comply with the statute.
The dissent argues that in concluding Defendants’ actions were not reasonable, we have disregarded reports from school employees and the concerns of three other physicians, and instead relied almost exclusively on Dr. Gooch’s statement that removal would harm Rusty. Dissenting Op. at 981-82, 984 & n.14, 985. While the statements of Dr. Joseph, Dr. Evans, and Dr. Bursch are relevant to our determination of the reasonableness of Defendants’ actions, they are not as compelling as the dissent suggests. Unlike Dr. Gooch, these physicians were not in regular contact with Rusty and two of them had not treated Rusty in at least six months. Moreover, these physicians merely suspected MSBP and their suspicions had not been confirmed after substantial efforts on the part of DCFS, Primary Children’s Medical Center, and Dr. Bursch. In fact, Dr. Bursch, an expert in MSBP, could not document any behavior that led to the conclusion that MSBP was being committed after watching the Roskas very closely during the time they spent at the UCLA Pain Clinic. Therefore, in addition to contacting these physicians, Defendants should have discussed Rusty’s condition and the possibility of preventive services with the person most likely to know about his current health, his main treating physician.[8] Although Defendants should have talked to Dr. Gooch before they made the decision to remove Rusty, at the very least they should have done so when they had Dr. Gooch on the telephone at the Roskas’ home.[9]
*976 The dissent disregards Dr. Gooch’s opinion that removal could harm Rusty based on its unsupported suggestion that Dr. Gooch was being manipulated by Mrs. Roska. Dissenting Op. at 984. The dissent notes that the “objective [of a parent with MSBP] is to retain a doctor that will buy-in to the facade.” Dissenting Op. at 984. Because Dr. Gooch disagreed with removal, the dissent suggests she must have “bought into” Mrs. Roska’s facade. The dissent’s approach of discounting the opinion of any doctor who does not support removal when MSBP is alleged, however, would render removal per se reasonable in all case involving allegations of MSBP. DCFS could use its suspicions of MSBP, even unsubstantiated ones as in this case, to ignore the opinion of any doctor who believed removal may harm the child and instead rely only on the opinions of doctors who support DCFS’s decision to remove. Such a rule would result in increased violations of parental rights and, more importantly, increased harm to children from the psychological and emotional trauma of removal in cases where it is unnecessary.
The dissent appears to discredit the relevance of Dr. Gooch’s opinion because it was rendered only after Mrs. Roska was told Rusty would be removed from the home. Dissenting Op. at 984, 986. The responsibility for the timing of Dr. Gooch’s opinion, however, rests squarely on the shoulders of Defendants. Although it is unclear whether Morrison spoke to Dr. Gooch or merely exchanged voice mail messages before deciding on removal,[10] at no time prior to arriving at the Roskas’ home did Morrison indicate to Dr. Gooch that there was an emergency or that removal of Rusty was under consideration. Thinking she would be able to sit down with Morrison in a week at their scheduled appointment to fully discuss Rusty’s condition and treatment, Dr. Gooch had no reason to express her concerns regarding removal because she had no idea removal was a possibility. Because Morrison failed to elicit the opinion of Rusty’s main treating physician when she first called her on the telephone, Defendants cannot rely on the timing of Dr. Gooch’s opinion to justify their actions.
Defendants also argue that the shelter hearing ruling shows their actions were in compliance with the statute and reasonable. At the shelter hearing, the juvenile court found that an emergency situation existed at the time of removal and concluded that DCFS’s failure to provide preventive services was thus reasonable. The juvenile court proceeding, however, does not inform our reasonableness analysis for two compelling reasons. First, the juvenile court noted in its ruling from the bench that it relied on Utah Code Ann. § 78-3a-306(14), which allows a judge to order continued removal of a child regardless of any error in the initial removal or a party’s failure to comply with the procedural provisions of Utah child protection statutes. Second, the juvenile court did not consider any evidence at the shelter hearing regarding Dr. Gooch’s opinion that removal could harm Rusty. Rusty’s parents submitted a letter from *977 Dr. Gooch explaining her opinion, but the judge did not consider it because it was not a sworn statement. Moreover, although Morrison testified at the shelter hearing, she failed to mention the telephone call from Dr. Gooch that Sneddon received before removing Rusty.[11] The next day at a hearing on a motion for a temporary restraining order, the juvenile court received a sworn affidavit from Dr. Gooch explaining her opposition to removal. After considering this evidence, the juvenile court returned Rusty to his parents’ custody with DCFS supervision. Because the juvenile court did not consider all the information at the shelter hearing that Defendants had when they removed Rusty, the juvenile court’s ruling is not dispositive.[12]
*978 Finally, the dissent notes that after Rusty’s removal and return home, he made substantial progress within several months, such that by January 2000, he was walking, attending school, eating, and gaining weight. Dissenting Op. 982 n.9. Rusty’s improvement after removal, however, is not relevant to our determination of whether Defendants’ actions were reasonable in light of the information they possessed at the time of removal. In any event, as the dissent acknowledges, Rusty’s improvement occurred with substantial supervision and services provided by DCFS. Rusty’s progress, at home with DCFS supervision, undermines Defendants’ contention that it was reasonable to believe the Roskas would not cooperate with DCFS and services would be difficult to devise and unsuccessful.[13]
Applying the factors this court articulated in Roska I, Defendants could have reasonably concluded Utah Code Ann. §§ 62A-4a-202.1 and -202.2 were constitutional and had not fallen into desuetude. Defendants, however, failed to actually comply with the statute upon which they purportedly relied. While only one of the Roska I factors weighs against concluding Defendants’ actions were objectively reasonable, it is an important factor and, in this case, it is dispositive. Mimics, Inc. v. Village of Angel Fire, 394 F.3d 836, 847 (10th Cir.2005) (denying qualified immunity based on reliance on a statute when official did not comply with statute). What made Defendants’ belief in the constitutionality of the statute reasonable was the statute’s balancing of the government’s interest in protecting children with a parent’s constitutional right to maintain a family relationship. Nevertheless, by failing to offer or provide preventive services that were reasonably available when faced with the opinion of the main treating physician that removal might harm Rusty more than allowing him to remain in the home, Defendants failed to properly consider and balance the parents’ interest. In light of the balancing required by the statute and the Constitution, this failure was objectively unreasonable. Defendants are therefore not entitled to qualified immunity.
*979 IV. Conclusion
For the foregoing reasons, this court AFFIRMS the district court’s denial of summary judgment to Defendants on qualified immunity and REMANDS the matter for further proceedings not inconsistent with this opinion.

. Although Mrs. Roska disputes many of the statements attributed to her by school employees, the dispute is irrelevant in this case. The issue we must decide is whether Defendants' actions were objectively reasonable in light of the information they possessed at the time of removal, regardless of whether the information was accurate or not. Plaintiffs do not dispute that school employees told Defendants Mrs. Roska made these statements.

. The only remaining parties are Plaintiffs Mr. and Mrs. Roska and Defendants Sneddon, Morrison, and Lasater. All claims by and against other parties have been dismissed.

. After Defendants filed a motion for summary judgment on qualified immunity, Plaintiffs filed a cross-motion asking for summary judgment based solely on their position that Defendants were not entitled to qualified immunity. The district court granted Plaintiffs’ motion, in part, without explicitly addressing the merits of Plaintiffs’ claims. Roska v. Sneddon, 311 F.Supp.2d 1307, 1318 (D.Utah 2004). Because this court previously held Defendants violated Plaintiffs' clearly established constitutional right, however, the effect of the district court's subsequent conclusion that there were no genuine issues of material fact and Defendants were not entitled to qualified immunity was a grant of summary judgment to Plaintiffs on liability.

. Utah child protection laws were amended after the events that gave rise to this litigation. The amended statute, which took effect in July 2002, requires exigent circumstances before DCFS can remove a child without a warrant. Utah Code Ann. § 62A-4a-202.1(l) (2000 & Supp.2005). All subsequent references in this opinion to the Utah Code are to the versions of the statutes in effect at the time Rusty was removed.

. The requirement of services before removal also recognized that removal can often be just as harmful to children as remaining in the home. See Utah Code Ann. § 62A-4a-103(2)(b) (DCFS “shall, when possible and appropriate, provide preventive services and family preservation services in an effort to protect the child from the trauma of separation from his family"). The process of removal itself can cause severe psychological and emotional trauma. Mark R. Brown, Rescuing Children From Abusive Parents: The Constitutional Value of Pre-Deprivation Process, 65 Ohio St. L.J. 913, 979-81, 987 (2004). Moreover, after removal, children are placed in temporary shelters or foster care, placements which are notoriously unstable and increasingly subject children to further abuse and neglect. Id. at 925; Kay P. Kindred, Of Child Welfare and Welfare Reform: The Implications For Children When Contradictory Policies Collide, 9 Wm. & Mary J. Women & L. 413, 460-64, 469-70 (citing a 1986 study that found incidents of abuse and neglect were higher for children in foster care than in the general population).

. The dissent argues the Roskas' failure to cooperate with DCFS during a prior investigation into allegations of abuse and neglect made Defendants’ belief that the Roskas would not comply with services reasonable. Dissenting Op. at 983. The evidence supporting the contention the Roskas did not cooperate during DCFS’s prior investigation, however, is shaky at best. In her Declaration, Sneddon stated, "[i]t was my understanding that Mrs. Roska had not cooperated with DCFS during the prior referral....” Lasater added, "[gjiven ... the family's prior history with DCFS ... it would have been impossible for DCFS to provide adequate in-home services From these statements, it does not appear that either Sneddon or Lasater participated in the prior investigation, and the source of their conclusory allegations is unclear. In any event, it is not surprising that a parent, when accused of abuse and neglect, whether rightly or wrongly, would be less than fully cooperative with DCFS’s investigation. Therefore, the Roskas’ failure to cooperate in the investigation, if true, is not an *974 indication that they would not comply with services.

. The dissent misconstrues our reliance on this court's prior determination that Rusty's health and safety were not in immediate danger by suggesting that another portion of our prior opinion, in which we determined Defendants had not violated clearly established law under the Fourth Amendment by entering the Roskas' home and seizing Rusty without a warrant, is "equally relevant.” Dissenting Op. at 986. In this appeal, the parties do not dispute that Defendants complied with the first prong of Utah Code Ann. § 62A-4a-202.1(2) because they had substantial cause to believe one of the factors in § 78-3a-301 existed. Instead, the issue in dispute is whether circumstances existed such that Defendants' failure to provide preventive services was reasonable pursuant to the second prong of the statute. Although we acknowledge there may be some circumstances in which a child’s health and safety are in such immediate danger that preventive services are not appropriate, we have already concluded that immediate danger did not exist in this case. Therefore, Defendants must provide some other reasonable explanation for their failure to provide preventive services.
Moreover, contrary to the dissent's assertion, the portion of our prior opinion discussing the Roskas' Fourth Amendment claim is not relevant to this appeal. In dismissing the Roskas' Fourth Amendment claim, we reasoned that there was some inconsistency in our case law regarding the degree of suspicion necessary for a social worker, as opposed to a police officer, to enter a home and remove a child. Roska v. Peterson, 328 F.3d 1230, 1248-49 (10th Cir.2003). Nevertheless, we concluded, at the very least, a social worker must have something approaching probable cause to believe a child’s health and safety are at risk and the risk is due to the child's presence in the home. Id. at 1249-50. Finding support in the record for the district court’s determination that Rusty’s health and safety were at risk and the risk was likely due to his presence in the home, we affirmed the district court’s ruling dismissing the Roskas' Fourth Amendment claim on qualified immunity grounds. Id. at 1250. That ruling is not relevant to this appeal, however, because it did not address whether Defendants complied with the second prong of the statute. In fact, at that stage of the proceeding, Defendants were relying on a different statutory provision, Utah Code Ann. § 78-3a-301. See id. at 1252. At most, the dissent’s citation to our prior opinion supports Defendants’ contention that they complied with the first prong of the statute, a contention that is not at issue here.

. The dissent repeatedly asserts Defendants believed Dr. Evans was Rusty's main physician and thus Defendants’ failure to elicit Dr. Gooch's opinion before removal was justified. Dissenting Op. at 982 n.10, 984-86. This contention is not supported by the record. Although Morrison testified she did not recall when she first learned Dr. Gooch was Rusty's main treating physician, there is evidence in the record to suggest Defendants knew of the important role Dr. Gooch played in Rusty’s treatment before they arrived at the Roskas’ home to remove Rusty. The school employees, from whom Defendants received much of their information about Rusty, knew Dr. Gooch was Rusty's main treating physician. One school official told Defendants when Rusty came to school looking ill and Mrs. Roska reported he was in kidney failure, she called Dr. Gooch to confirm Mrs. Roska’s statement. Additionally, Morrison found a note in Rusty's school records stating, "always talk with Dr. Gooch ... before taking mother’s word for anything.” Dr. Gooch was the first of the listed physicians who Morrison called when she began the investigation. Finally, before deciding on removal, Morrison "kick[ed] around the fact that [she] hadn’t talked to Dr. Gooch.”

. Alternatively, because the allegations of MSBP were unsubstantiated and Defendants had not yet talked to Rusty's main treating physician, Defendants could have sought approval of their decision to remove Rusty without providing services from an impartial judge. Defendants met with attorney Craig Peterson at eleven o'clock in the morning on the day of removal to discuss whether they had sufficient information to justify removal. After this meeting, Defendants had ample time to seek an ex parte order permitting removal before court closed for the weekend.

. Dr. Gooch's testimony suggests she actually spoke with Morrison. Dr. Gooch stated: "Somebody — I can’t remember who called me. I don’t know if it was Shirley Morrison had called me before and talked about — we had talked about meeting. There was no sense of urgency, though, to me with that discussion." Morrison’s testimony, however, is contradictory. Morrison stated in her deposition that she called Dr. Gooch's office and Dr. Gooch "told me curtly that she did not have the time to talk to me at the moment, that it was a complicated case, and that I needed to make an appointment to see her.” At the juvenile court shelter hearing, however, Morrison testified that she received "a message on my answering machine, my voice mail, from Dr. Gooch stating that the case was so complicated that she would prefer that I make an appointment to speak with her.”

. The dissent suggests the majority wrongly chastises Morrison for not mentioning the conversation with Dr. Gooch during removal because "Morrison was not asked about the telephone call during either direct or cross examination." Dissenting Op. at 987 n.17. During the shelter hearing, however, Morrison spoke extensively about each of her other contacts with Dr. Gooch. Morrison stated,
I did receive on the 28th a telephone call from Dr. — a message on my answering machine, my voice mail, from Dr. Gooch stating that the case was so complicated that she would prefer that I make an appointment to speak with her. I tried to make an appointment to speak with her before this hearing, however, she was completely booked up until Monday. I do have an appointment to speak with her on Monday at noon, however, she did call me recently and tell me that there was no need for that, that she had written a letter on behalf of the Roskas for court today.
Thus, we think it is quite surprising that Morrison did not mention the telephone call in which Dr. Gooch warned against removal.
A juvenile court shelter hearing is not an exercise in gamesmanship in which each party strives to divulge the least amount of information within the confines of the questions asked by counsel. The purpose of a shelter hearing is to determine what placement is in the best interest of the child. See Utah Code Ann. § 78-3a-306. Any information regarding the child's health and safety, including a statement from the child's main treating physician that removal may harm the child, is relevant and should be brought to the attention of the court, especially by a social worker tasked with protecting and promoting the best interest of the child.

. Although the juvenile court read the un-sworn letter from Dr. Gooch at the shelter hearing, the record indicates the court did not consider Dr. Gooch’s opinion. The dissent's assertion to the contrary is incorrect. Dissenting Op. at 987-88. After declining to return Rusty to his parents’ custody, the juvenile court ordered supervised visits, but agreed to leave the possibility of unsupervised visits open for future discussion. Counsel for the Roskas then stated, "If Dr. Gooch can't convince you that he needs to be home, I don't think there is anything we can do." The court replied, "I’ve never met or heard or seen Dr. Gooch. I don't know what Dr. Gooch would say.” When counsel for the Roskas referred to the letter from Dr. Gooch, the court again stated, "I don't know what, where Dr. Gooch is going to come down on this matter.” This exchange indicates the juvenile court did not fully consider the letter from Dr. Gooch in issuing its ruling at the shelter hearing. Cf. Harris v. Rivera, 454 U.S. 339, 346, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981) ("In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions.”); Havelock v. United States, 427 F.2d 987, 991 (10th Cir.1970) ("[W]hen a case is tried by a court without a jury, it is presumed, absent an affirmative showing to the contrary, that only material and competent evidence is considered.").
At the subsequent hearing on the Roskas’ motion for a temporary restraining order, counsel for DCFS argued, as the dissent does, that the Roskas had not presented any additional evidence to alter the court's earlier decision. Dissenting Op. at 987-88. Counsel stated, "we believe we went through this whole process yesterday and under consideration was Dr. Gooch's letter which, except for maybe some of the legalese which has been changed to irreparable physical and emotional harm and written by the attorney, signed by Dr. Gooch, I think it doesn’t, isn't any different than the letter that was taken under *978 consideration yesterday by the Court....” The court, however, disagreed, indicating that the sworn affidavit was different and relying on that affidavit to return Rusty to his parents’ custody.
Contrary to the dissent’s assertion, this second ruling was precisely an "about-face” based on additional information. Dissenting Op. at 988. At the shelter hearing, the juvenile court did not consider Dr. Gooch’s opinion because it was not legally relevant. Upon receiving Dr. Gooch's affidavit at the second hearing, however, the court acknowledged that it now had
a sworn statement from a doctor who is treating the child, who is one of (he principal people treating the child ... saying, Look, I know this child. I know the child's medical history and I think that we’re going to have some, some problems with this child being separated from his parents even if they're not doing a very astute job of caring for the child because the child is fragile and the child has this physical condition that exists in the real world regardless of what causes it. And because the child’s emotions play into that, there is a real risk here.
This additional information, which the juvenile court relied on in returning Rusty to his parents’ custody, is the very same information Defendants had when they made the decision to remove Rusty.

. The dissent attempts to negate the persuasiveness of Rusty's improvement at home with DCFS services by observing that the Roskas’ compliance was not voluntary. Dissenting Op. at 982 n.9. In making this point, the dissent seems to overlook the most fundamental dichotomy in this litigation which is the sine qua non of the dispute: to remove or not to remove. A decision not to remove premised on involuntary conditions would remain a decision not to remove. Had such a decision been made by DCFS to allow Rusty to *979 remain with his family, this case would have an entirely different complexion and would likely never have been filed.